### JACOBS et ux. v. BROOKS.

### No. 5681.

Court, of Appeal of Louisiana. Second Circuit.

April 29, 1938.

Rehearing Denied June 1, 1938.

Irion & Switzer, of Shreveport, for appellant.

Pyburn & Pyburn, of Shreveport, for appellees.

TALIAFERRO, Judge.

Plaintiffs, Thomas C. Jacobs and his wife, were injured in a collision between their Chevrolet coupe and the White tandem truck of defendant, being then driven by his agent, L. Q. Goodwin, which occurred on a bridge on the Mooringsport highway, nine miles north of the City of Shreveport, at about 4:30 P. M., April 13, 1937. They each sue to recover damages for physical injuries suffered by them in the accident. Jacobs also sues to recover the value of his car, which was totally destroyed, and for doctors', nurses' and hospital bills incurred in behalf of his wife.

Plaintiffs were enroute to their home, not far north of the locus of the accident. Jacobs was driving the coupe. The truck was traveling southerly. Its over-all length, including trailer, is 35 feet. It was laden with some oil well drilling machinery, weighing ten tons.

Responsibility for the accident and its results is alleged to have been the gross negligence of defendant's truck operator, in the respects hereinafter detailed. Jacobs avers that when he saw the truck and trailer approaching him on the bridge, he reduced the speed of his coupe to a very slow rate, sounded its horn, waved to the truck driver to stop, and pulled his own car as near to the bridge's east railing (his right side) as was possible, and brought it to a stop; that these signals and warnings were ignored by said truck driver who, notwithstanding them, proceeded to attempt to cross said bridge and to pass plaintiff's car; that at a point near the north end of the bridge, the truck was violently driven into and against the coupe, which, at the time, was standing still on its extreme right side of the bridge; that following the impact, the truck pushed the coupe backwards almost to the south end of the bridge before stopping. Plaintiffs recapitulate defendant's agent's negligence as follows:

"(a) He did not have his truck under proper control;

"(b) That his truck and trailer were not equipped with adequate and proper brakes;

"(c) That he was driving on the wrong side of the road;

"(d) That the load or body on said truck was of a width prohibited by law; that said truck and its load covered more than half of the width of the said road;

"(e) That he was driving at an excessive rate of speed;

"(f) That he was negligent in driving said heavily loaded truck and trailer towards said narrow bridge, and on said rough road, with which he was familiar, when he first saw or should have seen your petitioners crossing said bridge from the south, when the said truck driver well knew that the momentum of his heavily loaded truck and trailer would render it impossible for him to stop before going on said bridge where petitioner was crossing;

"(g) That he failed to maintain a proper lookout."

Defendant admits ownership of the truck and that it was being operated at time of the accident by its agent, Goodwin, in the

scope of his employment. Further answering, he avers that his truck, immediately prior to the collision, was moving at a speed of not more than 25 miles per hour, on its proper side of the highway; that it entered upon said bridge before plaintiff's coupe did; that despite the narrowness of said bridge, plaintiff heedlessly and recklessly entered thereon, whereas he should have waited until defendant's truck had cleared it; that, observing the situation ahead of him, defendant's operator pulled his truck as far as possible to his right to allow plaintiff to pass; that the coupe instead of continuing on its right side of the bridge, began to bear to its left side and continued to do so the entire time it was on the bridge, crossed the medial line thereof, and thus brought about the collision between the two vehicles; that said truck operator, as soon as he observed plaintiff entering upon the bridge, in the manner aforesaid, applied his brakes and was barely moving when the collision occurred near the bridge's south end; that plaintiff's car was traveling at the time at not less than 45 miles per hour and did not at any time reduce its speed by application of brakes or otherwise. Employing the above alleged acts of negligence of plaintiffs as a predicate, contributory negligence, in the alternative, is pleaded in bar of recovery by them.

There was judgment for plaintiffs as follows:

For Thomas C. Jacobs, $1036.85.

For Mrs. Jacobs, $3000.00.

Defendant appealed, and complains of the judgment on the merits and of the awards. Substantial increase in each award is here prayed for by appellees.

The bridge on which the accident occurred is 15.2 feet wide (between banisters) and 159 feet long. The highway from the north end of the bridge makes a gradual curve westerly. To one driving southerly, the curve is described as being a right hand curve. The concrete banisters to the bridge are 26 inches high. Its floor is surfaced with a mineral composition called "black topping". The road, as it leaves the bridge's southerly end is straight for nearly one-fourth of a mile. The collision actually occurred between the center of the bridge and its northern end. Plaintiffs place it nearer this end than does defendant's driver. The beds of the truck and trailer, according to Goodwin, the driver, are eight feet wide. The top of the machinery thereon was eight feet above the beds, approximately twelve feet from the ground. The body or upper part of this machinery is wider than its base, and as loaded, the body extended one foot beyond the eastern edge of the truck's bed. Therefore, the load on this truck, at least in part, necessarily extended beyond the center line of the road. If the right side of the truck were against the banisters (which is never the case when moving normally), there would remain only 7.2 feet clearance for another vehicle to safely pass, since the bridge is but 15.2 feet wide. The naked truck bed, allowing only six inches clearance on its right side when traveling, would extend beyond the road's center mark one foot. Taking into consideration the length and breadth of this truck and trailer, with its high and ponderous load, its very presence on this narrow bridge, moving at an admitted speed of 20 to 25 miles per hour, constituted an unusual hazard to safe traffic thereon. Goodwin admits that for a car to pass his truck on this bridge, "both would have to drive pretty close".

It is of some consequence, although not necessarily indispensable to a correct decision in this case, to determine which of the two vehicles first reached the bridge. Both drivers claim precedence. Neither stopped prior to driving thereon. Mr. Jacobs' version of the facts is supported by his wife's testimony. Only these three persons saw the accident. Jacobs and his wife testified that when they reached the bridge, defendant's truck was observed by them in the curve north of the bridge, a distance estimated at 150 feet; that they continued to drive forward, at a speed not exceeding 20 miles per hour, and were near the center of the bridge before the truck entered thereon; that when they realized the truck would not stop to allow them to first clear the bridge, Mr. Jacobs extended his hand and arm through the open panel (left side) of the car, began to reduce its speed, sounded his horn and holloed at Goodwin, in an effort to stop him; that their coupe was pulled against the banister on their side of the bridge, and was in this position, at a stop, when the left side of its front end was run into and rammed by the same part of the truck. They both say that the moment the coupe came to a stop, Mrs. Jacobs hurriedly attempted to get out of it, but that the door was too close to the banister to allow her to do so.

The contacted parts of the cars interlocked and remained so until disengaged by

force. The speed of the truck, plus its superior weight, drove the coupe backwards, scraping the east banister, for a distance, we think, of not less than 75 feet. Goodwin admits that immediately following the collision, the truck's course was changed to a small extent to its leftward, which, he says, was due to the left end of the front axle being bent rearwards by the impact. He drove the truck away on its own power.

Goodwin admits that at a momentum of 25 miles per hour, over one hundred feet is required to stop the truck loaded as it was. He often drove trucks over this bridge and well knew its location. There were no obstructions to vision from a point two hundred feet or more north of the bridge to twice that distance below it. The time of the accident was nearly two hours before sundown. Visibility was reasonably good. He contends he reached the bridge first. He says that he was on or at the bridge when he first observed the coupe 50 feet from its lower end. He contradicts this statement afterwards by testifying that he first observed the coupe about 150 feet south of the bridge when he "was right at it". If this were true, he only traveled 40 or 50 feet while the coupe moved over 250 feet. He also testified that Jacobs entered the bridge on his proper side and remained thereon until within a few feet of the truck, and then suddenly veered the coupe to its left and over the medial line to cause the collision. He also says that when he realized Jacobs intended to pass him, he applied his brakes forcibly, reduced the truck's speed to 15 miles per hour, and sounded its horn loudly. It is pertinent to inquire, why such acts of extreme precaution? It was daytime. Each driver could easily see the other's car. He admits Jacobs was then on his own side of the roadway. If his estimate of distances is dependable, when he was performing these acts of precaution, the coupe could not have been on the bridge at all. The thought occurs to us that these acts were performed after an emergency had been created by the truck, with its high and ponderous load, entering on the bridge from the curve, after Jacobs had done so, and at a speed entirely too fast in view of the circumstances and physical conditions there present. · Such an inference is supported by admissions of Goodwin at the locus of the collision, and very soon thereafter, to the effect that the heavy load on the truck prevented him from stopping it before entering on the bridge after observing the coupe thereon or so close to it that he knew it would reach it before he would. He then ascribed his inability to bring the truck under better control to inefficiency of the brakes. At same time and place he also assured questioners that his employer or his insurance carrier would absorb all damages resulting from the collision. He did not then and there take the position that the accident happened in the manner and from the causes he now claims.

■ Based upon the foregoing resume of facts, we conclude that the coupe and the truck were traveling at about the same rate of speed; not over 25 miles per hour; that there was no race for the bridge, but that the coupe reached it first and had covered half its length, or approximately so, when the truck entered thereon; that the truck driver should have seen the coupe in time to bring his vehicle to a stop before reaching the bridge, and his failure to see what he should have seen was due to lack of exercise of the degree of care and attention demanded by the circumstances; that it was negligence per se for the truck to enter the bridge, loaded as it was, while another car was thereon; that the truck driver's knowledge of the location and hazardous nature of the bridge required of him, under all the circumstances, exercise of the highest degree of care and caution to the end that an emergency such as that out of which said accident arose, could not happen. Consonant with the foregoing findings of fact, we find as an ultimate fact that in the effort to bring the truck under control after rounding the curve and entering the bridge at too rapid speed, it ran into plaintiff's car.

Mr. Jacobs is 62 years old. He had driven cars for many years.

The record is barren of even an insinuation against his prudence as a car operator. No reason whatever can be advanced for him to have deliberately driven his light car into the heavily laden truck, as Goodwin would have us believe. On the contrary, facing such a large vehicle with its tall and unwieldly load, he would naturally and spontaneously have pulled his car as far to the right as possible, as he and his wife say was true.

■ Paragraph 2 of section 9 (a) of Act No. 21 of 1932 (Highway Regulatory Act) provides:

"Any motor vehicle or combination of motor vehicles shall be equipped with brakes, adequate to stop such vehicle or combination of vehicles upon a reasonably clean, dry, level surface within a distance of forty-five (45) feet from the spot where such brakes are first applied, and when such vehicles or combination of vehicles are traveling at a rate of speed of twenty (20) miles per hour."

It is evident that this law was being violated in one or more respects by Goodwin's truck. His own admission convicts him of violating that part of the law which requires that a motor vehicle or a combination of such be equipped with brakes so efficient that it may be stopped within 45 feet, going at 20 miles per hour, on "a reasonably dry, level surface". Of course, if the surface is not dry, but wet or slippery, the speed of the vehicle should be accordingly reduced so that it might be stopped within said distance. Had this law been observed by the truck's owner and/or operator, the accident here discussed would not have happened. The truck could have been stopped before the collision occurred. To accentuate the correctness of these conclusions, we again refer to the fact that the truck shoved the coupe nearly 75 feet after the collision. Violation of this law was per se negligence and the proximate cause of the accident.

There is some testimony concerning the location of glass and tire marks on the bridge and scrapings against the banisters immediately after the accident. One witness says that the truck scraped its right side nearly the entire distance of the railings. This could not be true because it is admitted that after the collision the truck pushed the coupe nearly to the south end of the bridge. This could not have been done had it been dragging against the west bridge rail. Accidents are frequent on and about this bridge. Glass thereon is no uncommon sight. As to the tire skid marks, the testimony is at variance. Some of it tends to support the contention that the coupe was over the center line and some indicates that the truck was guilty of same offense. We do not attach any importance to these marks on this particular bridge.

█ Mrs. Jacobs was hurled against the dash and windshield of her car. The violence of the impact rendered her unconscious. She was immediately carried to a sanitarium and remained there for 25 days. Examination disclosed she was suffering from general contusions; small multiple cuts and lacerations to the face and nose; injury to upper and lower front teeth; fracture of the radius of her left forearm. The contusions affected the hip, back, left knee and ankle. Sedatives were administered to allay the pain. Three incisors of the lower and one of the upper jaw were so badly loosened as to necessitate removal. The alveolar process of the lower jaw was fractured and particles of bone taken out. Other teeth were loosened but were not removed because there was ground for hope that they would again become useful At time of trial there seemed to be no further complaint about the mouth's condition, and, presumably, the loss of the four teeth is the only permanent damage caused it by the collision. The fractured radius was set in a cast for several months. Union was excellent and the arm will ultimately be as useful as prior to the injury. On account of Mrs. Jacobs' age (58 years), she will not fully recover from the ill effects of her experience as quickly as would be the case were she much younger. However, the medical testimony leaves no doubt that within a year, or less, after the trial (October 21, 1937) her recovery will be complete. She has suffered considerable pain, aches and discomfort and was not clear of these at time of trial. In less aggravated form, these will continue for a while. She has been active about her home, yard and gardens. At time of trial she had not regained ability to engage in these domestic activities. The award of damages to her is not excessive.

█ Mr. Jacobs was more fortunate than his wife. He was shaken up badly and bruised to some extent. He suffered no broken bones nor serious flesh wounds. A small blood vessel of a leg was ruptured. There were two shallow scalp cuts. Naturally, he suffered bodily soreness for several days and could not sleep well. He admits he soon recovered from these minor injuries. The lower court, according to our calculation, allowed him $400. While fully adequate, we cannot say the amount is excessive.

For the reasons herein given, the judgments appealed from are affirmed with costs.