**MADDOX v. PATTISON et al. (MAGNOLIA PIPE LINE CO., Intervener).**

No. 5812.

Court of Appeal of Louisiana. Second Circuit.

Dec. 9, 1938.

Rehearing Denied Jan. 10, 1939.

Writ of Certiorari and Review Denied March 6, 1939.

Albert P. Garland, and J. Bennett Johnston, both of Shreveport, for plaintiff-appellant.

Parsons & Hunter, of Mansfield, and Cook, Cook & Egan, of Shreveport, for defendants-appellants.

Pugh, Grimmet & Boatner, of Shreveport, for intervenor-appellant.

HAMITER, Judge.

A collision between a one and one-half ton truck of the Magnolia Pipe Line Company and another of two-ton capacity belonging to W. C. Pattison of Mansfield, Louisiana, occurred on November 18, 1937, at the southern end of a narrow bridge on the Shreveport-Mansfield highway. The locus is in Caddo Parish, approximately 650 feet north of its boundary line with DeSoto Parish. At the time of the collision the Magnolia truck was being driven in a northerly direction by an employee of its owner, while the other vehicle, operated by Clayton Bates, an employee of Mr. Pattison who was acting within the course and scope of his employment, was proceeding toward the south.

Following the accident, Mrs. Evelyn Phillips Maddox instituted suit to recover damages against the said W. C. Pattison and his admitted insurer, Hardware Mutual Casualty Company, alleging that her husband, Jack H. Maddox, was an employee of the Magnolia Pipe Line Company and was riding in its said truck at the time, and that the collision was proximately caused by the negligent operation and handling of the Pattison truck and resulted in the death of her said husband. Her suit was numbered 74,041 on the docket of the First District Court of Caddo Parish, Louisiana.

Also as a consequence of the collision was suit No. 74,160 on the docket of said court, filed by Ben F. Buckliew against the above named defendants seeking an award of damages. He alleges that he was an employee of the Magnolia Pipe Line Company and was riding in its truck on the occasion in question, and that the negligent driving of the Pattison truck was responsible for his sustaining injuries which are totally and permanently disabling.

The truck of Mr. Pattison was protected by a policy of bodily injury liability insurance issued by the said Hardware Mutual Casualty Company. The mentioned coverage, however, was restricted to $10,000 for each person, with a maximum of $20,000 for each accident.

The acts of negligence attributed to Pattison's employee by the plaintiff in each of the mentioned suits are:

"(a) In driving the truck of W. C. Pattison at a high, excessive, unlawful and negligent rate of speed at the place of collision.

"(b) In driving said truck at a high, excessive and unlawful rate of speed of not less than fifty miles per hour towards the narrow bridge and on the narrow embankment near the place of collision.

"(c) In driving said truck at a high, excessive and unlawful rate of speed of not less than fifty miles per hour on the narrow embankment at and near the place of collision shortly after a rainfall when the pavement was wet, especially in view of the fact that the said Clayton Bates drove along said road almost daily, knew that the roadbed to the north of said narrow bridge was on a high, narrow embankment, knew that there was another narrow bridge some distance north of the bridge at which the collision occurred, knew that the bridge at which the collision occurred

was a narrow bridge, and knew the danger of travelling at a high rate of speed over such high, narrow embankment and the narrow bridges thereon in the vicinity of the place where the collision occurred.

"(d) In seeing the truck belonging to the Magnolia Pipe Line Company approaching the narrow bridge, near which the collision occurred, and in not retarding the excessive and high rate of speed at which he was traveling, and in not stopping the truck driven by him, or slowing the same down to such an extent as to be under his complete control before entering the narrow bridge near where the collision occurred.

"(e) In driving his truck partly on the left side of the center of the road.

"(f) In not passing to the right of the truck of the Magnolia Pipe Line Company without striking it, which he could easily have done if he had been driving the truck of W. C. Pattison at a reasonable rate of speed and had had complete control thereof just prior to the accident."

The named defendants filed a joint answer in each suit and, as disclosed by the brief of their counsel, urge,—"* * * that there was no negligence on the part of the driver of the Pattison truck; that the accident resulted solely from the fact that the Magnolia truck was defective and its driver lost control thereof; that Maddox and Buckliew suffered their injuries before the collision of the trucks, and that the Pattison truck was operated in a prudent and careful manner at all times by its driver. In the alternative the defendants plead that if it be held that the Pattison truck was negligently operated, the accident was caused by the contributory negligence of the driver of the Magnolia truck, which negligence is imputable to Mrs. Maddox and to Buckliew for the reason that Maddox and Buckliew were fellow servants of the driver of the Magnolia truck. The contributory negligence alleged is excessive speed by the driver of the Magnolia truck and the loss of control of the said truck by its driver, being the same facts pleaded by the defendants as the sole cause of the accident and alternatively pleaded as contributory negligence."

The Magnolia Pipe Line Company intervened in both proceedings, alleging, that it had paid compensation under the Louisiana Employers' Liability Act, Act No. 20 of 1914, as amended, to Ben F. Buckliew, and to the widow of Jack Maddox. It prays for judgments against said defendants for all amounts paid and to be paid as compensation by reason of said accident, and for reasonable attorney's fees for the filing and prosecution of the interventions. The making of the alleged payments is not disputed by the parties.

On written motion of defendants the two cases were consolidated for the purpose of trial. Thereafter they were tried by a jury at the request of the respective plaintiffs.

The judgment in the Maddox case, which was predicated on the jury's verdict, was in favor of plaintiff and against the defendants in solido for $9,500, with interest and costs.

It further decreed that, "intervenor, Magnolia Pipe Line Company, do have and recover out of such sum so awarded to plaintiff all compensation paid to plaintiff prior to the date of the collection of this judgment and $150.00 funeral expenses contributed by intervenor, together with twenty per cent attorney's fees on such compensation and such sum of $150.00."

Also based on the verdict of the jury was the judgment in the Buckliew suit. It condemned defendants in solido to pay to plaintiff the sum of $10,000, with interest and costs, and recognized the right of the intervenor, Magnolia Pipe Line Company, to be reimbursed out of such judgment the sums paid and to be paid its said employee as compensation. The fees of certain expert witnesses were fixed and assessed as costs in this judgment.

Defendants moved for a new trial and rehearing. The request was denied.

Thereafter they appealed to this court from both of the judgments, the appeals of the Hardware Mutual Casualty Company being suspensive and devolutive, while those of Pattison were only devolutive.

Also appealing devolutively was each plaintiff; but such appeals were from the judgments only in so far as they failed to grant the full amount of damages requested.

The intervenor likewise prosecuted devolutive appeals, and in the motions in support thereof set up that the judgments in its favor should have been rendered directly against the defendants.

The appeals of defendants have been answered by the plaintiffs. Each prays that there be a substantial increase in the damage awarded.

A discussion of the issues of both cases will be given in this opinion. However, we shall enter separate decrees.

■ A question of law is first presented for our consideration. It is the contention of defendants that the judgments should be reversed for the reason that the trial judge permitted plaintiffs to exercise eight peremptory challenges in the selection of the jury, whereas they should have been restricted to the use of six. Our attention is directed to section 13 of Act 135 of 1898, wherein it is stated that: "In the trial of all civil jury cases each party, plaintiff and defendant, shall be entitled to six (6) peremptory challenges, and no more". The argument is then advanced that by reason of the consolidating of the two cases for the purpose of trial, and of their being so tried, there was but a single law suit with two sides; that plaintiffs represented one side and the defendants the other; and that each division was entitled to only six peremptory challenges.

If plaintiffs had originally joined in a single suit against defendants on one cause of action, the contention urged would be appropriate and meritorious; but such is not the case here. Considering the nature and circumstances of this litigation, we think that the ruling of the district court was correct.

Mrs. Maddox and Buckliew instituted individual suits against defendants on separate causes of action. It is true that the proceedings grew out of the same vehicular collision and the issues in both causes respecting the question of defendants' liability are identical; yet, on the other hand, it is to be noted that the issues pertaining to the extent of injuries sustained are not the same, the parties litigant are different; and separate judgments were and are required to be rendered.

■ There seems to be no statutory provision of our procedural law directing or authorizing the consolidation, for the purpose of trial, of cases such as the instant ones. The authority for consolidating actions granted by articles 422 and 423 of the Code of Practice is not here relevant. However, for the purpose of expediting the trial of lawsuits and to provide a more economical and convenient administration of justice, our courts have seen fit to permit and cause the joint trial of two or more cases where the same evidence is determinative of the principal issues involved, even though the litigants may be different in the several causes. But this procedure does not, when resorted to, affect the respective litigants to the extent that they are deprived of privileges granted and guaranteed to them by law in the protection of their personal and property rights, such as those for the selection of the jury to pass upon such rights.

The United States Supreme Court offered the following pertinent remarks in the case of Mutual Life Ins. Co. v. Hillmon, 145 U.S. 285, 12 S.Ct. 909, 912, 36 L.Ed. 706, 707: "But, although the defendants might lawfully be compelled, at the discretion of the court, to try the cases together, the causes of action remained distinct, and required separate verdicts and judgments; and no defendant could be deprived, without its consent, of any right material to its defense, whether by way of challenge of jurors, or of objection to evidence, to which it would have been entitled if the cases had been tried separately. Section 819 of the Revised Statutes provides that in all civil cases 'each party shall be entitled to three peremptory challenges; and in all cases where there are several defendants or several plaintiffs, the parties on each side shall be deemed a single party for the purposes of all challenges under this section.' Under this provision, defendants sued together upon one cause of action would be entitled to only three peremptory challenges in all. But defendants in different actions cannot be deprived of their several challenges, by the order of the court, made for the prompt and convenient administration of justice, that the three cases shall be tried together."

Defendants argue that the cases of Schwing v. Dunlap et al., 130 La. 498, 58 So. 162, and Driefus v. Levy et al., La.App., 140 So. 259, lend support to their contention. These authorities are not relevant. Each was an action by one person against joint defendants. The consolidation of two or more suits was not involved.

■ In commencing a discussion of the merits of the instant controversies, we offer the remark that a record of enormous proportions confronts us. The following comment, found in one of the briefs submitted, reasonably describes such record and accounts for its size: "The trial of this case consumed one calendar week, during which the Court ran longer than its regular hours. There are voluminous pleadings in the record, a great many ex-

hibits and almost 700 pages of testimony." Furthermore, it might be said that the hopelessly conflicting testimony found in the transcript, and relating to many important and material facts, increases the difficulties of those charged with the duty of attempting a correct solution of the issues.

The Mansfield-Shreveport highway at and near the point of the collision runs north and south. It follows a straight course for a considerable distance. The bridge, at whose south end the accident occurred, is 141 feet long and measures 16 feet between the concrete banisters located on its sides. An abutment wing, extended outward and constructed of two four-inch pipe posts and two two-inch pipe rails, is located at each end of each concrete banister. The paved portion of the highway leading to and joining the bridge on its north and south is 18 feet in width. Conterminous to each edge of such pavement is a four-foot graveled shoulder. Bituminous metal pavement, or more commonly termed black-top, surfaces both the roadway and the bridge flooring. An embankment or fill, which enjoys various measurements of from five and one-half to eight and one-half feet from the pavement to the toe of the slope, runs a distance of approximately one mile and supports the highway in the vicinity of the bridge.

After working on a pipeline located east of Mansfield, Louisiana, a number of employees of the Magnolia Pipe Line Company, who constituted a working unit or crew, entered that company's truck about noon on November 18, 1937, and proceeded on a journey to Shreveport. The truck was operated by Kary Allums, a regular driver and timekeeper of the company, and sitting beside him was Charles E. Scadden, the foreman of the crew. The remaining employees, being eleven in number and including Jack Maddox and Ben Buckliew, were riding in the rear of the vehicle beneath a heavy canvas cover or tarpaulin, and they had no view of the roadway in front of the moving machine. Also in that rear portion were numerous tools customarily used in pipeline work.

As the Magnolia truck approached the bridge in question, Allums applied its brakes but they refused to function properly and the right front portion of the vehicle struck the concrete banister and abutment wing at the southeast end of the bridge. After

the elapse of a very short interval of time the left front portion of the Pattison truck collided with the said Magnolia truck.

The Pattison vehicle was being operated at the time by the above mentioned Clayton Bates, colored, who was proceeding south towards Mansfield with a load of merchandise that he had obtained in Shreveport pursuant to the directions of his employer. With him was another colored man whom he had "picked up" in violation of Mr. Pattison's instructions.

The only eye-witnesses to the collision were the foreman and the driver in the Magnolia truck and the two occupants of the other machine.

Immediately following the impact, Clayton Bates and his companion fled the scene. The explanation given for their running away was that they became scared when many white men emerged from the Magnolia truck.

The roadway was wet at the time because of a slight rain or mist that was falling. The collision occurred at approximately one P. M. o'clock.

When the Pattison truck came to a stop it was diagonally across the highway, off and south of the bridge, with its front end pointing in a southwesterly direction. The front wheels were resting on the graveled shoulder on the west side while the rear wheels were on the eastern portion of the pavement. Its rear end faced northeastward. A distance of approximately twelve feet intervened from the southern end of the bridge to the most northerly point of the truck.

South of the Pattison truck and nearly parallel thereto was the Magnolia truck. A distance of from two to three feet separated them. The front end of the latter machine was in the eastern half of the roadway and faced in a northeasterly direction, while the rear pointed southwesterly and was in the highway's western part. This truck, measuring from its nearest point, was approximately 20 feet from the south end of the bridge.

After the collision Jack Maddox was found lying unconscious on the pavement between the two vehicles in the western half of the highway. He died while being carried to a hospital. Assistance was given to plaintiff Buckliew when his co-employees noticed that his feet were held by some object within the truck and his body and head were hanging downward on the

outside near the left front corner of the truck's bed: Two of the other Magnolia employees lay in the ditch that runs along the western edge of the highway.

The respective theories of plaintiffs and defendants as to the cause of the sustained injuries and responsibility for the collision are widely divergent. Each is earnestly and vigorously contended for, and finds support from much evidence. We shall first endeavor to detail plaintiffs' version and thereafter that of defendants.

Plaintiffs assert that the Magnolia truck had been proceeding north towards Shreveport at a maximum speed of 30 miles per hour. It could not exceed 35 miles per hour because of a governor's restriction. On approaching the bridge in question, the driver, Allums, noticed the Pattison truck advancing from the north at a high rate of speed. Thereupon, and when about 50 feet from said bridge, he began the application of his brakes. Those on the right front wheel grabbed or locked, and by reason of this and while traveling about ten or twelve miles per hour the right front portion of the truck struck the south end of the east concrete banister of the bridge and its front wheels became wedged against one of the upright pipes of the abutment wing located there. The entire vehicle stopped on the east or its right side of the highway. At the moment of that impact, the Pattison machine entered the north end of the bridge at an excessive rate of speed. Immediately thereafter Bates put on the brakes and his truck skidded almost the full length of the bridge and into the Magnolia vehicle. The latter was struck just behind the cab and pushed south along the highway a distance of approximately 20 feet. The front wheels which had been wedged against the iron pipe were pulled from beneath it. The physical injuries in question were sustained when the two vehicles collided.

Defendants' version is well stated in the brief of their counsel. It is:

"It is the defendants' contention that the Pattison truck was being driven toward the bridge at a speed not in excess of thirty-five (35) miles per hour; that as the two cars approached the bridge the Pattison truck was nearer the bridge and the driver of the Pattison truck saw the Magnolia truck slow up and pull to one side for the obvious purpose of allowing the Pattison truck to go through the bridge first; that seeing that the Magnolia truck was giving him the right of way, the driver of the Pattison truck proceeded into the bridge and when he had run approximately half the distance through the bridge, the brakes of the Magnolia truck gave way; the Magnolia truck crashed into the southern end of the eastern concrete railing of the bridge, swung to its left and completely blocked the southern entrance to the bridge. That in this emergency the driver of the Pattison truck acted as anyone else would have acted in this unexpected situation, and, in fact, acted with more skill than most drivers could have acted. That the driver of the Pattison truck, as soon as the Magnolia truck struck the concrete railing, applied his brakes and ran straight down his own right hand side of the bridge so close to the railing on his right hand side as to almost touch that railing during the remainder of his trip through the bridge. That immediately upon coming to that point in the bridge where the concrete railing on the western side ended, the driver of the Pattison truck turned as far to his right as it was physically possible to turn, but was unable to avoid a slight collision with the Magnolia truck, as that truck was so completely blocking the road at the point referred to that the Pattison truck was unable to pass without a collision. That the Pattison truck was being slowed down from the time that the Magnolia truck collided with the concrete railing until the Pattison truck collided with the Magnolia truck, and that the Pattison truck had almost reached a standstill at the time of its collision with the Magnolia truck.

\* \* \* \* \* \*

"In addition to the facts of the accident as just outlined, it is the defendants' contention that Buckliew and Maddox fell from the Magnolia truck before the Pattison truck collided with the Magnolia truck, and that each suffered his injuries solely as the result of the collision of the Magnolia truck with the concrete railing."

It is further contended by defendants that the Magnolia truck was struck at or near its left rear wheel and not 'at the left front corner of the truck bed as plaintiffs claim.

Obviously, the jury which tried this litigation accepted the theory, and found the facts to be, as contended by plaintiffs. Its verdict is significant of this. Also, the trial judge stated in the written reasons which he gave in overruling defendants'

motion for a new trial that, "We approve the verdict of the jury in holding the defendants liable".

The members of that jury and the official who presided over the trial were certainly in a much better position than are we, in view of the great mass of conflicting testimony that confronts us, to determine the true situation surrounding the unfortunate occurrence. They sat for a full week and watched the actions of the various witnesses and listened to their testimony as it was given. We are not afforded that privilege. Considering these circumstances and as plaintiffs' version is entirely plausible and is supported by ample competent evidence, particularly by various physical facts, we are unable to disagree with the jury's findings and to hold that manifest error has been committed in that regard.

The aforementioned physical facts tend to substantiate the claim that the employees were catapulted from the Magnolia truck and injured when it was hit by the Pattison truck and not on the occasion of the former's striking of the concrete bridge abutment. As shown above, Maddox was found lying between the two trucks on the western half of the road, at a point more than 20 feet from the south end·of the bridge; and it does not appear that he was ever moved from the spot where he fell or that his body was mangled or disfigured. If he had fallen to the pavement on the truck's striking of the concrete abutment, and that machine had skidded to its left so as to completely block the south entrance to the bridge, as defendants contend, then certainly he would have been crushed by said Magnolia truck when it was pushed backward to its final resting place. Furthermore, plaintiff Buckliew would likewise have been crushed if he had been dislodged prior to the collision of the two machines. As noted above, his associates found him dangling from the left side of the truck bed; and photographs in the record disclose damage to the left door of the Pattison truck which is indicative of the fact that the left sides of the vehicles came together after the initial contact.

The physical facts also furnish the belief that the collision occurred on the east side of the highway, and that the Magnolia truck was first struck at a point just behind its cab. If the Magnolia truck had blocked the western side of the bridge and was hit at or near its left rear wheel by the Pattison truck proceeding close to the right hand rail and being steered to the right at the bridge's end, all as contended by defendants, such undoubtedly would have resulted in the precipitation of the said Pattison truck into the ditch on the west side of the highway; and the rear end of the Magnolia truck would have turned toward the center of the road and the front end would have been almost unaffected. Instead of that result both vehicles, as above described, travelled toward the south and stopped on and across the highway almost parallel to each other and in diagonal positions.

A number of witnesses called by defendants testified that they appeared at the scene of the collision before the trucks had been removed and noticed skid marks made by the Pattison truck as the result of the application of its brakes. According to all of them these marks were in a comparatively straight line, were traced to the wheels of the Pattison truck, and were confined entirely to the west side of the roadway. Their estimates regarding the distance of the skidding ranged from 25 feet to approximately one-half of the bridge's length of 141 feet. The referred to testimony is in direct conflict in many respects with that of some of plaintiffs' witnesses to the effect that skid marks, caused by the Pattison truck, appeared on both sides of the bridge and extended almost its entire length; and it cannot be reconciled with the established fact that the rear end and wheels of the Pattison truck were on the east side of the highway after the collision.

Defendants' contention that the Pattison truck was almost at a standstill when the collision occurred is refuted by the circumstances that attended and followed the impact. Its skidding for the considerable distance shown by the evidence, the sustaining of much damage to its left front portion, and its twenty-foot shove of the Magnolia machine, which at the time weighed in the neighborhood of 8,000 pounds and was bound to an iron pipe of the abutment wing, combine to corroborate the testimony of plaintiffs' witnesses that said Pattison truck was proceeding at a very rapid and excessive rate of speed when it entered the bridge. Evidently, it was then moving at a speed greater than 25 miles per hour. The following phraseology found in the opinion of Leitz v. Rosenthal, La.App., 166 So. 651, 653, is, we think, pertinent to this

discussion: "The oak step was broken and splintered at one end and the iron bar supporting the step was bent under the chassis of the truck, and the part supporting the step, which was rectangular before the accident, was bent in the form of a circle. It is inconceivable that this result could have been accomplished by an automobile which was being driven at the moderate speed of 18 miles per hour, after having skidded for 60 feet. We are not prepared to say, even in the light of the expert opinion in the record, what causes an automobile to skid, but it is obvious that its velocity is largely due to the speed at which it was driven before it started to skid."

At least it may be said that the speed employed by the Pattison truck was much in excess of that justified by the conditions and circumstances of the highway at the locus, and Bates was grossly negligent in so operating it. The bridge in question was comparatively narrow, the roadway extending from each of its ends was situated on a long embankment or fill, and the surface of the road, including the bridge, was wet; and all of these factors were well known to the driver. Then, too, he was aware of the approach of the Magnolia truck. It is our opinion that he did not use the care demanded of him by Rule 4, paragraph (a) of section 3 of Act 21 of 1932. This provides:

"(a) Except as herein provided and subject to the provisions of Rules 3 and 17, and subject to the special speed limits specified in this Act, it shall be unlawful for any person to drive or operate any motor or other vehicle upon the public roads, highways and bridges of this State at other than a careful, prudent, reasonable and proper speed, having due regard to the traffic, surface and width of the highway, the location and neighborhood, and any other conditions or circumstances then existing, and no person shall, under any circumstances or conditions, drive any vehicle upon the public roads, highways or bridges of this State, at such a speed as will endanger the life, limb or property of any other person; and, subject to the special provisions and limitations contained in this Act, the person so driving or operating, or causing to be driven or operated, a motor vehicle on such public roads, highways and bridges, shall be held and deemed to be prima facie at fault in and responsible for any accident or damage proximately flowing therefrom or connected therewith, which presumption, however, may be rebutted and overcome by proper showing of the contrary."

Even if it be assumed that the truck was traveling at not more than 20 miles per hour, there appears to have been a violation of paragraph 2, section 9(a) of said Act (No. 21 of 1932), which reads: "2. Any motor vehicle or combination of motor vehicles shall be equipped with brakes, adequate to stop such vehicle or combination of vehicles upon a reasonably clean, dry, level surface within a distance of forty-five (45) feet from the spot where such brakes are first applied, and when such vehicles or combination of vehicles are traveling at a rate of speed of twenty (20) miles per hour."

According to the testimony of most of the defense witnesses, the skid marks caused by the brakes of the Pattison truck ran a distance of approximately half the length of the 141-foot bridge, and this skidding was on wet pavement. Plaintiffs' witnesses, as above noted, fix a greater distance.

The last quoted statutory provision was referred to and discussed by us in the recent case of Jacobs v. Brooks, La.App., 182 So. 349, 353. In our opinion therein, we stated: "It is evident that this law was being violated in one or more respects by Goodwin's truck. His own admission convicts him of violating that part of the law which requires that a motor vehicle or a combination of such be equipped with brakes so efficient that it may be stopped within 45 feet, going at 20 miles per hour, on 'a reasonably dry, level surface'. Of course, if the surface is not dry, but wet or slippery, the speed of the vehicle should be accordingly reduced so that it might be stopped within said distance. Had this law been observed by the truck's owner and/or operator, the accident here discussed would not have happened. The truck could have been stopped before the collision occurred. To accentuate the correctness of these conclusions, we again refer to the fact that the truck shoved the coupe nearly 75 feet after the collision. Violation of this law was per se negligence and the proximate cause of the accident."

It is further contended by defendants that they "were not negligent because when the Pattison truck entered the bridge the Magnolia truck had pulled to one side and slowed up for the purpose of letting the defendants come through the bridge first", and that this action amounted to an invitation to so proceed. Their counsel refer us to the tes-

902

timony of the driver of the Magnolia truck regarding his intention on nearing the bridge, and also to that of his co-employee who sat beside him. In the transcribed testimony of the driver, we find: "I had applied my brakes to stop and my brakes did not work just like· they usually did. The reason I was applying my brakes to stop was because this other truck was coming so fast that I was afraid to meet him on the bridge."

Even if it be conceded that the slowing and ultimate stopping of the Magnolia vehicle ·constituted an invitation to the other truck to proceed or the granting to it of what might be termed a right of way on the narrow bridge, Bates was not entitled to abuse that privilege, as he did, by the improper and careless operation of his truck; and such abuse worked a waiver or revocation of whatever preference right that was originally his.

· Considering then the fact that the Magnolia truck remained on the eastern or its right side of the road after striking the bridge abutment, as was found by the jury and with which finding we are unable to disagree, and considering further the gross negligence on the part of the Pattison driver in the operation of his machine, it appears certain, and we hold, that the collision was proximately caused by that negligence. There would have been no collision if the last mentioned vehicle had been under proper control and handled in the manner directed by the above quoted provisions of law.

■ It is urged by defendants that if Bates was negligent, the operator of the other vehicle was contributorily negligent, and his negligence is, under our law, imputed to the injured co-employees and bars recovery in these suits. Their counsel cite and rely on numerous Louisiana authorities to support this contention.

If it be assumed that Allums, the driver of the Magnolia truck, was contributorily negligent, we are of the opinion that there was no imputation of his negligence to Jack Maddox and Ben Buckliew. The last named two employees were riding in the rear or bed of the truck and had no control whatever over its operation. Their vision in the direction of travel was completely obstructed by the overhanging canopy. Communication between the driver and those occupying the truck's bed was extremely difficult, if not impossible. .

■ The mere fact that the driver and the injured men were fellow servants of a common employer and engaged in a mission at the time that was within the course and scope of their employment does not of itself make all of them participants in a joint enterprise such as would render each responsible for the negligence of the others. Martin v. Yazoo & M. R. Co., La. App., 181 So. 571.

"Where two fellow servants having duties to perform for their common employer, the one wholly distinct from the duties of the other, are severally engaged in the performance of such duties, the contributory negligence of the one driving or operating a conveyance will not be imputed to the one riding with him. The rule is otherwise, however, where both employees are charged with the duty of operating and controlling the conveyance." 45 Corpus Juris, verbo, "Negligence", § 593.

The authorities submitted for our study in connection with counsel's last stated contention have no relevancy whatever. They involve the fellow-servant doctrine, as it existed prior to the enactment of the Louisiana Employers' Liability Act, in claims asserted by employees against their employers. The instant causes concern controversies existing between employees and third persons.

■ This brings us to a consideration of the matter of quantum.

Jack Maddox was twenty-five years of age at the time of his death, and he had a normal life expectancy of thirty-eight years. His average monthly income was approximately $130. No children survived him. His widow, in her petition, alleges damages for the loss of the earning capacity of her said husband, for the mental pain and suffering she has experienced and for the deprivation of his love and companionship. She further alleges expenditures occasioned by the funeral. Her prayer to be compensated is predicated on these referred to allegations. She asks no damages to which her husband might have been entitled. The jury awarded her, as before stated, the sum of $9,500.

At the time of the trial in May, 1938, plaintiff Buckliew was approximately 38 years of age. Continuously since his sixteenth birthday until injured, he had been engaged in oil field work, most of which was common labor. He was in the employ of the Magnolia Pipe Line Company during

the three-year period immediately preceding the accident, and when the injuries were sustained was earning approximately $170 per month. His family consists of a wife and two children, and he states that he is caring for two children of a deceased sister-in-law.

Following the collision he was taken to a hospital where he was confined for nearly three months. Thereafter he was removed to his home, and a goodly portion of his time since then has been spent in bed. It is his testimony that he can no longer perform manual labor, that he has endured and still suffers considerable pain, and that he now walks with a limp.

The X-ray pictures disclose that he sustained in the accident a transverse separated fracture of the left lateral processes of the third, fourth and fifth lumbar vertebrae, a U-shaped fracture of the left side of the sacrum, and a fracture of the pubic and ischial ramus, at their junction with the pelvic crest, with a displacement of the medial fragment.

Buckliew's attorney called five medical experts, including the physician who specializes in X-ray work and made the above referred to pictures, for the purpose of proving the extent of the injuries sustained. None was placed on the witness stand by the defendant. The physician who attended and treated the injured man during hospitalization and thereafter did not testify as a witness for either side, although it appears that he was available.

The physicians giving testimony, other than the X-ray specialist, first examined Buckliew approximately five months after the accident. They attest that a material and noticeable difference exists in the length of his legs, and that the nerves, tendons, muscles and tissues surrounding the fractured bones were injured. It is their opinion that much pain and suffering attended and followed the injuries, and that such plaintiff has been rendered totally and permanently disabled to do the work to which he is accustomed and fitted.

As shown above, the jury awarded Buckliew the sum of $10,000.

It is a well settled principle of law of this state that a verdict of a jury respecting the assessment of damages must be given much weight, and will not be interfered with by an appellate court unless the amount awarded appears to be clearly out of proportion. Muscarelli v. Hodge

Fence & Lbr. Co., 120 La. 335, 45 So. 268; Starnes v. Pine Woods Lumber Co., 122 La. 284, 47 So. 607; Lancon v. Morgan's Louisiana & T. R. & S. S. Co., 127 La. 1, 53 So. 365; Rickerson v. Town of Minden, 127 La. 407, 53 So. 667. Certainly, the sums granted to Mrs. Maddox and to Buckliew are not excessive, and we are unable to say that they are manifestly inadequate; consequently, we shall not change the jury's assessment in either case.

With respect to the appeals prosecuted by intervenor, Magnolia Pipe Line Company, its attorneys state: "Judgment in these consolidated cases was rendered in favor of the plaintiffs, and the right of Magnolia Pipe Line Company to recover its expenses, compensation payments and attorneys' fees out of the amount of said judgment was recognized. Intervenor has no complaint to make with reference to the amount awarded it, but deems itself entitled to a direct judgment against the defendants for such amount."

We think that there is merit to the contention. Paragraph 2 of section 7 of the Louisiana Employers' Liability statute, being Act 20 of 1914, as amended by Act No. 247 of 1920, provides that if an injured employee shall bring suit against a third person to recover damages for the physical injuries sustained, his employer may intervene in the suit as party plaintiff to recover any amount which he has paid or become obligated to pay as compensation to such injured employee. And according to paragraph 3 of said section, where the employer has so intervened and the damages recovered "shall not be sufficient or shall only be sufficient to reimburse the employer for the compensation which he has actually paid, with a reasonable attorney's fee, to be fixed by the Court rendering the judgment, and his costs, such damages shall be assessed solely in his favor; but if the damages shall be more than sufficient to so reimburse the employer, the excess shall be assessed in favor of the injured employee or his dependent * * *."

As the Magnolia Pipe Line Company is entitled in the instant cases to direct judgments against defendants, it will be necessary to amend and recast the judgments appealed from.

For the foregoing reasons the judgment of the district court in this, the Maddox, case is amended and recast so as to read:

It is ordered, adjudged and decreed that the defendants, W. C. Pattison and Hardware Mutual Casualty Company be and they are hereby condemned, in solido, to pay to Mrs. Evelyn Phillips Maddox, plaintiff, and the Magnolia Pipe Line Company, intervenor, the full sum of $9,500, with legal interest thereon from March 30, 1938, the date of judicial demand, and all costs of this suit; that out of such amount the Magnolia Pipe Line Company shall receive all compensation paid by it to the said Mrs. Evelyn Phillips Maddox prior to the date of the collection of this judgment and $150 funeral expenses contributed by it, with legal interest thereon from judicial demand, together with twenty per cent attorney's fees on such compensation and such sum of $150, and the costs of its intervention; and the balance of said amount shall be paid to and be received by plaintiff, Mrs. Evelyn Phillips Maddox.