Plaintiff instituted this suit for damages against the defendant railway company as the result of the death of her husband, Clarence Alford. Plaintiff sues individually and as the duly qualified natural tutrix of the three minor children born of her marriage with decedent. To these proceedings intervened the Solvay Process Company, in whose employ the decedent was engaged at the time of his death, seeking to recover compensation paid and to be paid by reason of its liability under the Workmen's Compensation Statute. Act No. 20 of 1914, as amended. Plaintiff originally joined as a party defendant one Rufus G. Coleman, engineer of the defendant railway, who was operating the locomotive of defendant involved in the fatal accident, but dismissed her action against the said Coleman as of nonsuit prior to judgment. After trial there was judgment in favor of plaintiff individually and against the defendant in the sum of $10,000.00, and in favor of plaintiff as natural tutrix for the three named minors against the defendant in the sum of $5,000.00 for each of said minors. There was further judgment in favor of the intervenor against both plaintiff and defendant to the extent of the amount of weekly compensation paid by intervenor by reason of the death of plaintiff's husband, to date of final judgment, together with the sum of $750.00 as attorney's fees, with the provision that the sum of $300.00 of said total amount allowed as attorney's fees be charged against plaintiff, and the sum of $150.00 thereof be charged against each of said minors. The judgment also provided that the railway company pay intervenor by preference and priority out of the amounts awarded plaintiff.
From the judgment defendant has appealed. Plaintiff has answered the appeal, praying for an increase in the amount of the judgment to the widow to the sum of $12,000.00, and an increase in the amounts awarded each of the minors to $7,000.00. Intervenor has also answered the appeal, praying for an increase in the amount allowed as attorney's fees to the sum of $1,000.00, and further praying for the allowance of $150.00 expended for burial charges, and the sum of $15.00 representing ambulance charges, for the allowance of both of which items it originally contended.
The death of Clarence Alford resulted from a collision between a train of 12 cars loaded with stone, crushed rock and stone screenings, drawn by a 50-ton locomotive of the Solvay Company, operated at the time by the said Alford, and a train of 21 empty freight cars which was at the time being pulled by a 75-ton locomotive of the defendant, operated by its engineer, Rufus G. Coleman. At the time of the accident the Solvay Company train was en route from the stone quarry of said company to defendant's switch yards at Carla, while defendant's train was engaged in switching operations.
It is desirable in the interest of clarity to set forth in some detail the locus a quo, which may be generally designated for the purpose of description, as what is known as the Winnfield Yards of the defendant railway company. These yards extend in a northerly direction along the main line *Page 260 
track for a distance of some 3 miles out of the town of Winnfield, Louisiana, and include what is called the Carla yards, which consist of the main line and two switch tracks designated as the middle "rail" and the back track. Also included in the yard set-up is the single tract which leads from what may be called the west switch of the Carla yards for a distance of 2.57 miles to the stone quarry of the Solvay Company.
The Solvay track, beginning immediately past the Carla yards, makes a four degree curve to the right in the direction of the Solvay quarry. This curve of some 600 feet in length passes through a cut, and the right-of-way on each side is grown up with underbrush and some timber, all of which contributes to the obstruction of view of the track in the curve. Testimony as to the distance which permitted a clear view is so hopelessly conflicting that we are unable to reach any accurate conclusion as between the brackets of 225 and 430 feet, which are the distances urged by plaintiff and defendant respectively. However, we are convinced that the obstruction to the view was of such degree as to render the negotiation of this curve a dangerous operation, necessitating the exercise of the utmost caution.
At about the hour of 1:15 P. M. on September 17, 1945, at a point some 400 feet more or less from the west switch of the Carla yards, there was a collision between the two trains above described. At the time defendant's train was being pulled by the locomotive operated by Coleman, which was backing in the direction from which the Solvay train was proceeding. The facts conclusively show that the decedent, Alford, was operating the locomotive of the Solvay train in the cut of the curve with throttle closed, at a speed of not more than four to six miles per hour when he first perceived evidence of defendant's approaching train in the smoke of the locomotive which was rising above the obstruction to the view. It is established that Alford immediately applied his brakes and sounded two short blasts of the locomotive whistle, followed by one long blast. It is further established that during the switching operation the engineer of defendant's train was backing at a very slow rate of speed, but, unquestionably, both he and his fireman, who were occupying their respective positions in the cab of the locomotive, were directing their attention principally forward, that is, toward the 21 empties which they were pulling. The first warning of the approach of the Solvay train appears to have been the sound of the last blast of its whistle, which was heard by the fireman of defendant's crew, who immediately called a warning to the engineer. The warning was promptly heeded, the brakes were applied and the throttle thrown into reverse, but these last moment efforts were unavailing.
In the ensuing collision the tender of defendant's locomotive was driven over the Solvay locomotive and both were derailed against the wall of the cut. Alford, engineer of the Solvay locomotive, was buried beneath the debris. The body was removed some hour or so later and death must have been instantaneous.
Plaintiff bases her claims to recovery upon the alleged negligence of defendant's agents and employees. Defendant denies the numerous charges of negligence, specifically and generally, and, on its part, alleges in numerous counts the negligence of decedent Alford as a bar to plaintiff's recovery.
We deem it unnecessary to burden this opinion with a detailed discussion of the multitude of charges and counter charges of negligence, many of which are exceedingly far-fetched, and, accordingly, prefer to confine our discussion in this opinion solely to those facts which are pertinent and material to a determination hereof.
Under date of December 7, 1938, the superintendent of Solvay Process Company, intervenor herein, issued a memorandum to his operating foreman, copies of which appear to have been directed to such officials and employees of both intervenor and defendant as was proper in view of the subject matter. Inasmuch as the matters comprehended in this memorandum have been heavily emphasized by astute counsel for all the parties litigant, we set forth the body of the instrument in full as follows:
"In anticipation of the joint use of the LA track between our plant and Carla by both our locomotive and the LA locomotives the following instructions are being issued to become effective at once. *Page 261 
"It has been agreed between the LA operating organization and this office that there shall be no movement made over the above mentioned track without there first being a telephone contact between the men in immediate charge of both crews. The Solvay Weighmaster is hereby instructed that he must call the LA yard office and obtain clearance before proceeding from this plant to Carla. It is understood that the LA Yardmaster will be instructed to call the Solvay Weighmaster and obtain clearance before proceeding from Carla to our plant.
"It shall be the duty of the Solvay Switchboard Operator to make a permanent record of such telephone contacts between the LA and Solvay crews, showing the date, time and persons making the contact.
"We anticipate that there might be occasion for the LA to obtain a clearance from Solvay at sometime other than the hours when the switchboard is in operation, namely, 8 A.M. to 4 P.M. week days and 8 A.M. to 12 Noon Saturdays. In anticipation of the possibility of the LA desiring to use the track on Saturday afternoon or Sunday, the Solvay Weighmaster is hereby instructed to give the LA yard office clearance at the time our locomotive is put on the spot for the week end and also each day when it is put on the spot for the night.
"The Solvay Weighmaster shall keep a permanent record of each telephone contact he makes with the LA yard office.
"The above instructions are being issued for the purpose of making the joint use of the Carla track safe for both crews. This office has attempted to cover any contingency that might arise. However, should there be any question in the minds of the Solvay crew as to whether they have a clear track to Carla, do not move until a certainty can definitely be established. Needless to say it is expected that the Solvay crew when en route to Carla will handle the train in such a manner that it is under complete control at all times."
The burden of plaintiff's contention is that defendant negligently disregarded the operational procedure outlined in the above instrument. Defendant equally as seriously and diligently contends that the accident resulted by reason of a complete disregard of the operational procedure by the decedent and other responsible employees and officials of intervenor. For reasons which are hereinafter set forth in the course of this opinion, we are much inclined to the belief that the memorandum set forth and its bearing upon the accident, which is the basis of this litigation, have been overemphasized. Nevertheless, recognizing the distinguished counsel representing the parties litigant in this cause as being among the most outstanding and able trial lawyers in the State, we are impelled to note and discuss the several contentions which are urged by them.
The testimony in the voluminous record before us, which was assembled over a period of four days of trial, bearing upon this particular point was so contradictory as to defy every effort at reconciliation. In discussing this point it is necessary that we outline as briefly as may be the testimony bearing thereon, hopelessly conflicting though it is.
Plaintiff's witness, John W. Harper, who holds the position and title of weighmaster for the Solvay Company, testified positively that he called defendant's telegraph operator, C. I. Row, at 11:15 o'clock on the morning of the fateful day of September 17, 1945, advising the said operator that the plant was short of empties and if defendant's train could not get out to the plant by 1:00 P.M. he would bring the Solvay train in to Carla. Defendant's operator, Row, testifies just as certainly that Harper fixed the hour not at 1:00 P.M., but at 1:00 or 1:30 P.M.
In this conflicting testimony lies the crux of the opposing charges of violation of the operational agreement.
The undisputed facts show that Harper, who in his position as weighmaster was in charge of the Solvay train and its operations, proceeded to act in full and complete accordance with the details of the understanding as to which he testified. At about 12:30 P.M. the Solvay crew began assembling its train, consisting of 12 loaded cars, weighing, connecting and coupling same to the locomotive. At 1:05 P.M. the Solvay train began its trip to Carla, reaching the *Page 262 
point of the accident, some mile and three quarters or two miles distant, at 1:15 P.M.
It is inconceivable that Harper, an experienced man, who had occupied a responsible position for a period of many years with the Solvay Company, would have permitted a train under his direction to enter upon a trip on a single line track 25 minutes before expiration of the deadline which he himself had fixed in his conversation with defendant's operator some two hours before.
It is strenuously and skillfully urged on behalf of defendant that the circumstances surrounding the actions of its employees are also in full and complete accord with their understanding of Harper's telephone conversation. In support of this argument it is contended that Row made a written memorandum of the conversation, which memorandum was taken over by defendant's yardmaster, one John Rogers, from which he made up a similar memorandum, a carbon copy of which he gave to the listman. It is claimed that in accordance with this alleged authority to move on the track defendant's employees properly proceeded with their operations in the belief that there would be no movement from the Solvay plant to Carla before 1:30.
Under the circumstances we are unable to sustain defendant's position, and in support of our conclusion we cite the following facts which are completely and utterly at variance therewith.
First, according to the testimony of defendant's operator, Row, his conversation with Harper was not conclusive, for he himself testified that he told Harper it would be necessary for him to call back. Row was unquestionably without any authority to make any arrangement, particularly in view of the fact that defendant's yardmaster, Rogers, who was the responsible official, was not even on duty at the time. As a matter of fact, it developed that Rogers, without making any effort to confirm any arrangements, left the Carla yards and went home to lunch, and was there during the time of the movement of the trains and the accident.
Second, we are impressed with a circumstance which vigorously militates against defendant's contention. Admittedly, Harper was in need of empty cars at the Solvay plant, and it was with the transportation of these empties from Carla yards to the plant that he was primarily concerned. This being a fact, to the knowledge of defendant's officials and employees, it is not reasonable to believe that defendant's locomotive was switching 21 empties for the purpose of clearing a track in order that the locomotive might alone proceed to Carla for the purpose of picking up the loaded cars and returning therewith. Yet these are the facts which are testified to by defendant's witnesses.
Third, there is the time element to be considered. If in truth 1:30 was the understood ultimate deadline by which defendant's locomotive must be at the Solvay plant, the fact that it was engaged at 1:15 in switching operations which of necessity must have been completed before beginning the trip outbound from Carla leaves considerable doubt as to whether the deadline could have been met. We are firmly convinced that defendant's employees, if in reality they intended this operation, were guilty of negligence in cutting the time margin to a point which, according to our view, imputes negligence and lack of proper precaution despite the testimony of defendant's listman to the effect that the "light" engine could have made the trip in the time available.
Fourth, and finally, it is clear, accepting the testimony of defendant's witnesses at face value on this point, that the agents and employees of defendant violated the express requirements of the memorandum governing operations with respect to the provision requiring telephone contact for the purpose of advising of the proposed movement.
Consideration of the above facts inescapably leads to the conclusion that defendant's major position is untenable.
By way of argument it might be urged on defendant's behalf that Harper was guilty of negligence in ordering the movement of the Solvay train before again contacting defendant. This argument might be persuasive were it not for the fact that Harper's actions substantiate, beyond any *Page 263 
question in our minds, his testimony that he had advised defendant's operator that he would move from the Solvay plant after 1:00 P.M. There is a further fact to be considered in this connection, namely, that Harper testified to making several efforts to contact defendant's operator between 12:30 and 1:00 o'clock. The attempt is made by learned counsel for defendant to seize upon this point as indicative of Harper's uncertainty. This conception is somewhat strained in the face of the very practical assumption that Harper was simply attempting to determine whether defendant's train was actually en route.
Despite the fact that out of deference to diligent counsel we have devoted such detailed consideration to the point discussed, we are firmly of the opinion that this is not a controlling issue. Conceding, arguendo, the negligence of Harper, the Solvay yardmaster, in failing to properly contact defendant for the purpose of definitely fixing the time of movement of the Solvay train, this would not be a proximate cause of the accident. If, and only if, the collision had occurred between the Solvay train proceeding to Carla and the defendant's train or locomotive actually engaged in proceeding toward the Solvay Plant, would this issue be of such pertinency and material effect as to control the finding of negligence.
We are further inclined to the same conclusion by reason of the fact that the negligence of the Solvay weighmaster, under the doctrine of respondeat superior, cannot be imputed to Alford, a subordinate employee. In other words, defendant has failed to show any knowledge in or responsibility upon Alford which would charge him with negligence by reason of his failure to comply with the precautionary requirements embodied in the memorandum above set forth.
Thorough consideration of this case convinces us that judgment must rest upon a determination of the issue of negligence on the part of defendant's agents and employees in connection with the operations in which they were actually engaged at the time of the accident. On this point we have encountered comparatively little difficulty in reaching a conclusion. The facts above related conclusively show that defendant's locomotive, coupled to a string of 21 empty freight cars to which the air brakes had not been connected, backed out of the Carla yard tracks on to the Solvay line, along which it was proceeding for the purpose of clearing the Carla west switch. Due to the curve of the track the engineer and fireman of defendant's locomotive could see in the direction of their following train of empties for a distance of only some six or seven car lengths. The crew brakeman was in position on top of one of the cars and it was his duty, under the circumstances of the operation, to catch the signal from the listman at the time the last car passed the switch, and relay same to the engineer or fireman. The testimony preponderates in favor of the fact that immediately preceding the collision both the engineer and fireman were intent in watching for such a signal. It is therefore apparent that their attention was in exactly the opposite direction from the approach of the Solvay train despite the fact that they were on a single line open track, and negotiating a dangerous curve. This is indisputable in view of the fact, which is uncontradicted, that the fireman of defendant's crew did not observe the approach of the Solvay train until he heard the last of three whistle blasts, and the engineer was entirely in ignorance of the danger, heard none of the whistle blasts and received his warning of danger from his fireman. Unquestionably, these engine men were guilty of gross negligence in not maintaining a proper lookout under the existing conditions.
It may be contended that a careful lookout to the rear of defendant's moving train was unnecessary since the crew was under the impression that no train would move from the Solvay plant before 1:30. This is a specious argument. If, as a fact, which is somewhat questionable, this was the understanding of defendant's train crew, it was an understanding which had been reached some two hours before and there would not have been the slightest reason in the world for them to assume that the plans of operation might not have been changed at any time up to the very moment they *Page 264 
were ready to begin an actual trip to the Solvay plant.
A backing operation by any vehicle is hazardous at any time, and under the conditions and surroundings described, this particular operation was fraught with possibilities of the most serious and immediate danger. We can conceive of no excuse for the failure of defendant's crew to take reasonable and proper precautions in the execution of this movement. Unquestionably, their negligence in this respect was the immediate and proximate cause of the accident.
The need for extraordinary caution on the part of defendant's crew under the circumstances of this case was emphasized by past experience. The testimony in the record, as adduced from witnesses for defendant as well as plaintiff, incontrovertibly establishes the fact that on one occasion, within a period of only some 30 days more or less prior to the accident here involved, defendant's locomotive, proceeding toward the Solvay plant, had met a train en route to Carla and, of necessity, had been forced to stop and reverse directions and retrace its route in order to avoid an accident. Indeed, there is some substantial testimony to the effect that defendant's crew had encountered this same situation on several occasions. These incidents should have impressed defendant's employees with the need for exercising the highest possible degree of care in connection with their operations on the Solvay track.
It is now necessary to proceed to a consideration of the defense of contributory negligence. First, defendant urges that the air brakes were not connected on all of the 12 cars of the Solvay train. This charge has not been established by the preponderance of the evidence. It is true that defendant's claim adjuster and traveling engineer testified that a test of several of the cars at the rear of the Solvay train indicated that the air brakes were not operating. These tests by the witnesses referred to were made by "feeling the bleed rods" of the cars. Each of these witnesses approached the scene of the accident, several hours after the occurrence, from the rear of the Solvay train. They testified that the test which they made failed to disclose connected air brakes until they had reached the fifth or sixth car from the rear end of the train. Their testimony is refuted not only by that of plaintiff's witness, Harper, but we think conclusively by a completely disinterested witness, one Delton Varnell, who came upon the scene of the accident very shortly after it occurred and whose testimony on this point was both intelligent and certain to the effect that the air brakes were connected on the rear cars of the Solvay train.
Defendant has also attempted to make the point that the deceased engineer, Alford, was guilty of negligence by reason of the improper manner in which he attempted to apply the brakes of his train when confronted by the existing emergency. Even had this fact been conclusively established, which it was not, it is susceptible to brief disposition on the ground that the operator of a vehicle is not chargeable with negligence by reason of a mere error of judgment with respect to his reaction in an emergency.
We find no other points in connection with the several allegations of contributory negligence which we deem of sufficient substance or pertinence to merit detailed consideration. We pretermit discussion of the question of excessive speed of the Solvay train since we could not consider even the top estimate of six miles an hour to be excessive under the circumstances.
Without question the decedent, Alford, was maintaining a careful lookout. The brakeman on the front board of the locomotive, the fireman in the cab, were on the alert. It is a tribute to Alford's diligence in this respect that he noticed and evaluated the presence of danger even before he actually saw defendant's train. Instinctively responding, he attempted to warn, by whistle blasts, the operators of any train occupying the track ahead of him, and immediately upon seeing physical evidence of the approaching train he made every effort to avoid the accident.
Insofar as we are able to determine there are no points of law involved in the instant case, and it must turn entirely upon *Page 265 
a determination of facts. Our appreciation of the facts reflected in the record results in the findings which we have set forth, namely, that plaintiff has established negligence on the part of defendant and defendant has failed to satisfactorily substantiate its charge of contributory negligence as against decedent. These were the conclusions reached by our learned brother of the district court, with whose findings we are in complete accord.
Diligent counsel for defendant, in oral argument and in brief before this court, challenges the right of the court to consider the testimony of Rufus G. Coleman elicited by plaintiff, on cross-examination, on trial of this case. The objection is based on the argument that the testimony cannot be considered against Coleman's codefendant, the Louisiana 
Arkansas Railway Company, and that the force of this objection is not lessened by the subsequent dismissal of the suit against Coleman.
With respect to this contention, we are impressed with the fact that counsel admitted in brief that he saw nothing contradictory in Coleman's testimony. We have carefully examined the testimony adduced on cross-examination and find nothing in the same which is prejudicial or detrimental to appellant's defense. In our opinion the particular testimony originally given on cross-examination could be entirely eliminated without adverse effect upon plaintiff's position and, conversely, it is susceptible of being retained and considered without adverse effect upon the position taken by defendant railway company. For this reason we think the question raised is moot and without material or pertinent bearing upon the issues presented.
There remains for our attention only the matters presented in the answers of plaintiff and intervenor to defendant's appeal. We have given careful consideration to plaintiff's plea for an increase in the amount of the judgment. The decedent was 48 years of age and at the time of his death was earning a salary of $215.00 to $225.00 per month in the employ of intervenor. His life expectancy was something in excess of 22 years. These factors, together with the loss of support, companionship, love, care and protection, were all taken into consideration by the district judge in arriving at the amount of his award, which we think is adequate.
With respect to intervenor's plea for an increase in the amount of attorney's fees and the allowance of the amount expended for burial and ambulance charges, we are disposed to feel that the sum of $750.00 as compensation for attorney's fees is reasonable. The sum of $15.00 claimed for ambulance charges was not established by the proof, and therefore was properly disallowed.
While it is true that Section 7 of Act No. 20 of 1914, as amended, Dart's Statutes 4397, does not specifically provide for the right of an employer to recover any amounts except compensation payments, attorney's fees and costs, we think it would be inconsistent with the obvious purpose and intent of the provision to refuse the right of an employer to recover other necessary expenses which it has paid out. This would appear to be the trend of holdings in the comparatively recent cases of Maddox v. Pattison, La. App., 186 So. 894; Williams v. Campbell, La. App., 185 So. 683; Streetman v. Andress Motor Co., La. App., 189 So. 321, 323. In this case the employer established the payment of the sum of $150.00 for burial expenses, which sum we believe him entitled to recover.
In a supplemental and amended answer to the appeal intervenor further prays for the allowance of legal interest on the amount of compensation. For the same reasons as above stated in connection with the claim for reimbursement of burial expenses, we think the demand is proper and should be allowed.
For the reasons assigned the judgment appealed from is amended to the extent that there is now judgment in favor of the Solvay Process Company, intervenor, against the defendant, Louisiana Arkansas Railway Company, and the plaintiff, Mrs. Jessie Lowe Alford, in solido, in the full sum of $1,000.00, plus whatever additional amount or amounts intervenor may have paid or may pay in the nature of compensation to the said named plaintiff, together with interest on said amounts so *Page 266 
paid, or which may be paid, at the legal rate, from date of payment thereof, together with the sum of $150.00 heretofore paid by intervenor for burial expenses, and the further sum of $750.00 as attorney's fees for instituting and prosecuting its claim and intervention. It is further ordered that the judgment in favor of intervenor have preference and priority, and that said amount as above stated be paid to the intervenor by the defendant railway company out of the total amount of the judgment awarded plaintiff.
As amended the judgment appealed from is affirmed at appellant's cost.