AYRES, Judge.
This is an action for damages allegedly sustained by plaintiff as the result of a collision between a 1946 model Chevrolet truck of the Department of Highways of the State of Louisiana, driven and operated at the time by plaintiff, and a two-wheel trail *571 er which became detached from a 1953 model truck of the same make and body-style, driven and operated at the time by the defendant James Burford. Impleaded also as a defendant is Southern Farm Bureau Casualty Insurance Company, the insurer of the truck of one Elmo Smith, from whom Burford borrowed it. The trailer was the property of both Burford and Smith.
The Maryland Casualty Company, plaintiff’s employer’s workmen’s compensation insurance carrier, intervened and prayed for reimbursement out of any award in plaintiff’s favor of all compensation payments made by it to plaintiff, as well as medical expenses and other costs expended by it, and for a reasonable attorney’s fee.
There was judgment in favor of plaintiff against the defendants, in solido, for the principal sum of $7,662.43 and in favor ■of the intervenor against plaintiff and-defendants for $2,169.34 for reimbursement •of compensation paid previous to March 7, 1955, plus whatever additional compensation paid between said date and June 2, 1955, together with $346 for reimbursement -of medical expenses and an attorney’s fee of $250, which amounts, together with legal interest thereon from judical demand, were ordered paid by preference and priority out of plaintiff’s award.
From the judgment thus rendered and signed, the defendants took and perfected this appeal. Plaintiff has answered the appeal, praying that the award be increased to $29,150, as originally prayed for. The in-tervenor likewise through an answer to the appeal prayed that the award in its favor for medical fees and expenses be increased to $651.50.
The foundation of this action is an accident which occurred about 1:30 P.M. August 31, 1953, on U. S. Highway No. 171, a concrete paved highway in DeSoto Parish. Plaintiff was proceeding in a southerly direction in the aforesaid truck. Burford was traveling in the opposite direction meeting plaintiff with his truck and trailer on a return trip from transporting a mule to an auction at Grand Cane. Both vehicles were being operated at a speed of from 35 to 40 miles per hour, which was moderate and reasonable under the circumstances prevailing at the time, the road being straight, visibility good, and traffic normal. When the trucks were some 40 to 50 feet apart the trailer became detached, Bur-ford’s truck veered to its left, crossing the center line of the highway and striking plaintiff’s truck in its own lane of travel and knocked it and plaintiff into the ditch on its right-hand side of the highway. Prior to the time the trailer became detached, there was nothing to warn either party that such might likely occur.
The trailer hitch was of a “homemade type”. Two parallel iron bars on the trailer fit, respectively, on the top and bottom of an iron bar on the truck in which there were holes through which a bolt was inserted making the coupling. There was a flange at the top of the bolt to prevent its slipping downward and it was secured at the bottom by a nut screwed against the lower iron bar. No safety device was provided in the event the trailer became detached from the truck. This hitch was very similar to the one described by the Court of Appeal for the First Circuit in Manguno v. City of New Orleans, La.App., 155 So. 41, 42. In that connection, the trial judge in the instant case stated:
“A trailer hitch of this kind will often strip the threads when a depression in the road is encountered, or a sudden lurch will often cause the tongue to bind in its attachment to the bar on the truck or car, and will strip the threads from the bolt with which it is attached. It is also significant that unless the nut is locked with a cotter pin or other device which would secure it, that in the vibration and twists and turns made on the road that it is easy enough for the nut to work loose and allow the pin or bolt to work upward and out of the hole securing it to the hitch. It will be noted that the plaintiff (defendant) said he encountered a ‘dip’ in the road immediately prior to the accident.”
*572 Burford attached the trailer to the truck and tightened the nut on the bolt, which attachment he inspected at Grand Cane before beginning the return trip. Nevertheless, the trailer became detached and the accident occurred. In the Manguno case, the court stated:
“We experience little difficulty in reaching the conclusion that the defendant’s employees were guilty of negligence because its evidence shows that the trailer became unfastened due to the vibration which caused the coupling to turn in such a position as to dislodge the pin. If the coupling had been properly and carefully made, there is no doubt that the accident would not have occurred.”
The distinction between the Manguno case as well as the instant case from the case of New York Fire Insurance Co. v. Kansas Milling Co., 227 La. 976, 81 So.2d 15, 18, is that in the latter case the trailer hitch was of proper construction but improperly and carelessly hitched or hooked up by defendant’s employee, whereas, in this case and in the Manguno case the hitches themselves were defective and insufficient, and by their use the trailers were insecurely attached to the trucks. A footnote in the opinion in the New York Fire Insurance Co. case reads:
“The burden of proof in the instant suit is similar to that which exists in a res ipsa loquitur case.”
In that case, Justice Hawthorne stated:
“The logical inference to be drawn from these facts is that the truck and trailer became disconnected at the time of the accident because they had been improperly hooked up by defendant’s employees.
“To rebut this inference of negligence the employees of the defendant Kansas Milling Company testified that they connected the trailer to the truck in the usual and customary manner and checked to see that the trailer and truck were properly engaged, and that they had no idea what made the device become disengaged and unhooked. In addition to the testimony of these witnesses defendants also offered the deposition of a mechanic in Oklahoma,, who testified that he examined the fifth wheel involved in this case. We do-not know exactly when this examination took place, but it was apparently made after the trailer and the fifth wheel had been returned to Shannon in Oklahoma. This witness testified that he found the fifth wheel cracked and pretty badly worn, and that the truck and trailer could have possibly become disconnected for this reason. We are not very much impressed with this testimony. Defendant offered no evidence to show that there was any mechanical defect in the fifth wheel at the time of the accident, and defendant’s employees who were present when the accident occurred and who were familiar with this device did not suggest that a mechanical defect might have caused the mishap.”
Neither do we think in the present case that defendants have discharged their burden imposed upon them by law to-adduce evidence which would lead to a fair and reasonable conclusion that the accident was not due to any fault or negligence on the part of defendant Burford. On the contrary, in our opinion, such fault and negligence have been established on-his part without doubt.
Defendants urge their plea of contributory negligence, contending there was room on the shoulder of the highway and that plaintiff should have driven thereon to a place of safety and avoided the collision. This plea is without merit. In the first place, it is not shown but what the trailer would have continued its course and collided with the truck even had it reached the shoulder of the road. Moreover, plaintiff was confronted with an emergency, not of his making or creation, and lacked time, space and opportunity to- *573 react to the situation and do anything effective to prevent the accident. As stated, both vehicles were making about the same speed, and when the trailer became detached, they were 40 to SO feet apart, and, with only one-half of that distance to be traveled by each of these vehicles, effective means of avoiding the accident could not have been undertaken and put into effect. When the court subsequently appraises the facts and circumstances surrounding an accident, it should take into consideration the excitement and confusion existing, if any, when one is suddenly confronted with an emergency not of his creation or choosing. It would be unjust to require the party, when faced with such danger and under such circumstances, to use the same circumspection and cool and deliberate judgment in estimating the danger or in choosing a means of avoiding it as we, who are unaffected by the danger, excitement and confusion, now exercise in subsequently contemplating it. To do so would be to ignore the laws of nature, requiring a degree of perfection to which we have not attained. Alford v. Louisiana & Arkansas Ry. Co., La.App., 38 So.2d 258; Michelli v. Rheem Mfg. Co., La.App., 34 So.2d 264; Muse v. Chambley, La.App., 16 So.2d 276; Hagaman v. Bankers Indemnity Ins. Co., La.App., 7 So.2d 390. There is no question of defendant’s liability.
The most serious question presented for determination is the matter of the quantum award. This depends upon the nature, duration and extent of plaintiff’s injuries, pain and suffering and disabilities sustained by plaintiff as a result of the accident. A proper determination of this issue is not without considerable difficulty.
The trial judge was of the opinion that plaintiff grossly exaggerated his injuries, was uncooperative with the doctors and sought to mislead them in their examinations and that there is a great deal of feigning injury on his part. A review of the record reveals this conclusion was not without some substantial basis. He did conclude, however, that plaintiff did sustain injuries and undergo pain and suffering and held that $4,000 was adequate compensation for such injuries.
From our review of the record, the trial judge correctly evaluated the evidence on this phase of the case as disclosed by an excellent written opinion. His findings appear not only without manifest error but amply supported by the testimony adduced on the trial of the case.
Testifying for plaintiff were Doctors Dayton L. Moseley, Jacob Segura, Ford J. MacPherson and Heinz K. Faludi. The defendants offered the testimony of Doctors Gene D. Caldwell and Frederick C. Boykin.
Following the accident plaintiff was taken to the Curtis Clinic at Mansfield, where he was hospitalized for a period of 15 days, after which he was released to return home and continued under treatment as an outpatient. On admission to the clinic, Dr. Moseley found plaintiff in good general condition, without shock, but complaining of pain in the left side of his back. There were no dislocations or fractures and plaintiff’s blood pressure was only slightly elevated. The Doctor found plaintiff had received bruises to the superficial tissues and muscles of the right side of the back in the lumbar area and appeared to have considerable pain. After plaintiff’s release from the hospital he continued to complain of pain, of which Dr. Moseley was not able to find any objective symptoms, and for that reason plaintiff was referred to Dr. Gene D. Caldwell. Dr. Moseley was of the opinion that within 4 to 6 weeks following the latter part of September, 1953, plaintiff should have been able to return to normal activity.
Dr. Segura, who later examined plaintiff, who was complaining of continued headaches and pain in his back, found no objective symptoms to support those complaints.
Dr. MacPherson, in connection with a re-examination, discovered there was a fracture through the transverse process on the left of the third lumbar vertebra, the edges of which were described as bright, *574 suggesting delayed union. He found tenderness and muscle spasm directly over the fracture, as disclosed by the X-ray. On January 11, 1954, Dr. MacPherson found plaintiff still suffering from some back pain and pain in his left leg, but considerably improved. The Doctor reported as of January 6, 1955, plaintiff was physically able to resume the duties of his former occupation. His opinion was that plaintiff had suffered a permanent partial disability of 16 percent of the body as a whole.
Dr. Boykin found no objective symptoms of any continued incapacity and was of the opinion that plaintiff had completely recovered; that whatever symptoms he had were subjective only.
Dr. Caldwell examined plaintiff on four occasions and testified that plaintiff had fully recovered and was able to return to work.
Dr. Faludi examined plaintiff August 12, 1954, at which time plaintiff was complaining of pain in the occipital region and in the lower back, left leg and chest and showed considerable nervousness. Plaintiff, in his opinion, had reached an anxiety state of hysteria.
We are impressed, as was the trial judge, with the testimony of Dr. MacPherson, wherein he stated that it was his opinion as of January 6, 1955, that it would be advantageous for plaintiff to engage in some physical activity; that he recommended that plaintiff do so and that he considered him physically able to do it, and that the performance of the duties of any physical occupation would be helpful to plaintiff. To the contrary, however, was the opinion of Dr. Faludi, who thought perhaps plaintiff’s condition would continue a matter of years before it completely cleared.
While the testimony of the experts is conflicting, we are not in position to say, after consideration of the whole testimony, that manifest error exists in the judgment appealed from. The award in plaintiff’s favor, in our opinion, is not shown to be either excessive or inadequate.
The trial judge rejected intervenor’s demands for amounts paid by it to Doctors Caldwell, MacPherson and Overdyke aggregating $260, as well as amount expended for plaintiff’s traveling expenses from his home to Shreveport in connection with the examinations made by these surgeons. The basis of the rejection of these claims was the conception that the examinations and reports were for the benefit of counsel in the preparation of the case for trial. By reference to the dates of the examinations, the date of the accident and the date of the filing of plaintiff’s suit, it is seen that these examinations were in no way connected with a preparation for trial. Moreover, proof of these items was made by joint offerings of plaintiff and in-tervenor. They are the ones concerned as the payment thereof comes from plaintiff’s award. Plaintiff makes no contest or opposition to this claim of the intervenor. The judgment should, accordingly, be amended in accordance with the intervenor’s prayer.
For the reasons herein assigned, the judgment appealed is amended by increasing the amount awarded the intervenor, Maryland Casualty Company, for expenses, from $346 to $651.50, and, as thus amended, the judgment is affirmed.
Amended and affirmed.