Before
SAMUEL, Judge.
These two suits were consolidated for trial in the district court and for argument here. They arise out of a collision between a tractor-trailer and a pickup truck which occurred on October 8, 1965 in the intersection of Claiborne Avenue and Canal Street in the City of New Orleans, Both drivers were in the course and scope of their employment at the time of the accident.
Plaintiff in suit No. 3,289 of our docket is William J. Carlisle, Jr., driver of the tractor-trailer owned by Texaco, Inc., his employer. Defendants in that suit are Joseph H. Martin (driver of the pickup truck), Young Sales Corporation (owner of the pickup truck and Martin’s employer), and Employers Mutual Liability Ins. Co. of Wisconsin, Inc. (erroneously designated in the title as “Employers Mutuals of Wau-sau”, liability insurer of the pickup truck). Travelers Insurance Company, compensation insurer of Texaco, intervened for the amount of Carlisle’s medical expenses paid on his behalf by Travelers under the Workmen’s Compensation Law.
Suit No. 3,290 of our docket was instituted by Texaco against Martin, Young and Employers Mutual for $2,637.31, the amount of damages to Texaco’s tractor-trailer as a result of the collision.
After trial the district court concluded the sole proximate cause of the accident was the negligence of defendant Martin in running a red light and striking the Texaco truck which was crossing Canal Street on a green light. Judgment was rendered in suit No. 3,289 in favor of plaintiff, Carlisle, and against all three defendants in solido, in the lump sums of $11,000 for disability, pain and suffering and $1,500 for future medical expenses, or a total of $12,500, and in favor of in-tervenor, Travelers, and against two of the defendants, Young and Employers Mutual, in solido, in the sum of $725.31, the stipulated Carlisle medical expenses paid by Travelers. In suit No. 3,290 judgment was rendered in favor of plaintiff Texaco and against Young and Employers Mutual in the sum of $2,637.31. Defendants have appealed suspensively in both suits.
We note that the defendant driver Martin was not cast in the suit filed by Texaco or in that portion of the judgment in suit No. 3,289 which is in favor of the inter-venor Travelers. However, neither Texaco nor travelers makes any complaint about the omissions; neither has appealed or answered these appeals. We also note that, if we find no negligence on the part of the Texaco driver, appellants concede there is no other issue relative to Texaco.
The essential facts of the accident are not in dispute. Carlisle was driving the tractor-trailer downtown, in an easterly direction, in the middle traffic lane of Claiborne Avenue. On the uptown side of Canal Street this avenue is divided by a neutral ground into east and west-bound roadways of three lanes each. On the downtown side of Canal Street, it narrows to two lanes on each side of the neutral ground. Canal is a main traffic artery running from the river towards the lake. It is divided into north and southbound roadways, separated by a neutral ground. The defendant pickup truck, which was traveling on Canal Street in a northerly direction towards the lake, ran a red traffic light. The plaintiff vehicle, which had a *154 green light, was struck in the northbound lane of Canal by the pickup truck after the tractor-trailer had almost traversed the downtown side of the intersection.
Appellants contend: (1) the plaintiff driver was guilty of contributory negligence; (2) alternatively, the court erred in rendering judgment for intervenor Travelers in addition to the amount awarded to Carlisle, the injured plaintiff driver, and that the same should have been awarded by preference and priority out of the amount awarded to Carlisle; (3) the award for personal injuries is so excessive as to constitute an abuse of discretion; and (4) the award for future medical expenses is unsupported by the evidence.
With regard to the first contention appellants argue that while the defendant-driver admittedly was negligent, Carlisle also was negligent in driving the tractor-trailer into the downtown half of Canal Street at a time when it was obvious the defendant-driver was not going to yield the right-of-way. They rely on the cases of Sims v. Miller, La.App., 193 So.2d 890, and Polk v. New York Fire and Marine Underwriters, Inc., La.App., 192 So.2d 667, holding that, if the superior driver sees or should see the inferior vehicle is going to violate his right-of-way, where he has a reasonable opportunity to avoid the accident by evasive action and fails to take such action he is guilty of negligence which is a proximate cause of the accident.
We do not find the facts of the accident place the instant case within the scope of this jurisprudential rule. Carlisle testified he first saw the defendant vehicle as he started to cross the southbound lanes of Canal Street. At that time the pickup truck was in a northbound lane of Canal Street, approximately three-fourths of a block from the Claiborne Avenue intersection, traveling at an estimated speed of 35 to 40 miles per hour; the traffic signal light was green for Carlisle and red for the pickup truck. He felt at that distance the defendant vehicle had ample time to stop for the red light. Knowing the Claiborne Avenue roadway would narrow to two lanes on the downtown side of Canal Street and his vehicle, which was in the middle lane on the uptown side traveling downtown, would be in the outer lane when he entered the two-lane roadway, he concentrated his attention on two vehicles traveling on Claiborne to his left.
We are satisfied that when Car-lisle saw the pickup truck it was a sufficient distance away from the intersection, and was traveling at such a speed, that if it had been driven properly it could have been stopped before entering the intersection. Carlisle had no reason to believe otherwise. After his observation of the approaching defendant vehicle, his attention to the vehicles to his left was proper since the light was in his favor and, in addition, since his own roadway narrowed to two lanes. He had the right to rely on the assumption that the defendant-driver would obey the traffic signal. We find no negligence on his part.
Appellants’ second contention is directed to the judgment in favor of Travelers, intervenor and subrogated compensation insurer of Carlisle’s employer, in the sum of $725.31 for medical expenses paid by Travelers for Carlisle. They argue this amount should be paid by preference and priority out of the judgment rendered in favor of Carlisle. We do not agree.
The provisions of the Workmen’s Compensation Law pertinent to this contention are Revised Statutes 23:1101, 23:1102 and 23:1103, which read, inter alia:
“When an injury for which compensation is payable under this Chapter has been sustained under circumstances creating in some person * * * other than the employer a legal liability to pay damages in respect thereto, * * * the payment or award of compensation hereunder shall not affect the claim or right of action of the injured employee * * against such third person, * * *; and *155 such injured employee * * * may obtain damages from or proceed at law against such third person to recover damages for the injury.
Any employer having paid or having become obligated to pay compensation under the provisions of this Chapter may bring suit against such third person to recover any amount which he has paid or become obligated to pay as compensation to any injured employee * * *” LSA-R.S. 23:1101.
“If either the employee or his dependent, or the employer, brings suit against a third person as provided in R.S. 23:-1101, he shall forthwith notify the other in writing of such fact and of the name of the court in which the suit is filed, and such other may intervene as party plaintiff in the suit.” LSA-R.S. 23:1102.
“In the event that the * * * employee * * * becomes party plaintiff in a suit against a third person, as provided in R.S. 23:1102, and damages are recovered, such damages shall be so apportioned in the judgment that the claim of the employer for the compensation actually paid shall take precedence over that of the injured employee * * *; but if the damages are more than sufficient to so reimburse the employer, the excess shall be assessed in favor of the injured employee * * *” LSA-R.S. 23:1103.
It is true, as appellants argue and as is stated in Andrus v. Great American Insurance Company, La.App., 161 So.2d 113, 116,“* * * the Louisiana jurisprudence has consistently characterized the compensation-reimbursement rights of the employer as merely a right to share in the award [emphasis ours] which the injured employee is entitled to recover upon his own cause of action for his own personal injuries.” The injured workman’s employer is accorded, out of the judgment for damages which may be assessed against the tort feasor, the amount he has paid, or become obligated to pay, to or for the injured employee (Marquette Casualty Company v. Brown, 235 La. 245, 103 So.2d 269). And while it is true that the quoted R.S. 23:1101 does not specifically provide for the right of the employer to recover anything except “compensation” which he has paid or become obligated to pay under the Workmen’s Compensation Law, it is clear that “compensation” includes, and the employer can recover, all payments he is required to make by that law (see Alford v. Louisiana & Arkansas Ry. Co., La.App., 38 So.2d 258). This includes not only weekly compensation benefits but also medical expenses.
This is not an instance where the employer seeks reimbursement for the regular weekly compensation payments made by him to the injured employee, which payments are taken out of the latter’s award for pain, suffering, etc. Involved here is only a special item of damages, the medical expenses occasioned by the collision. If Carlisle had been awarded the stipulated $725.31 for those expenses, and such an inclusion would have been entirely proper since Carlisle was entitled to an award for all expenses occasioned by the accident as well as for the injuries he sustained thereby, appellants’ contention would be correct. For in that event, under the judgment as rendered in favor of Travelers the defendants would be required to pay the same medical expenses twice. But Carlisle was not awarded the $725.31 for those expenses; the only award for that item was to Travelers. To revise the judgment only to the extent defendants argue it should be revised, i. e., so as to make the $725.31 payable out of the award to Car-lisle, without adding that amount to Car-lisle’s award, would result in the defendants not being required to pay the medical expenses for which they clearly are liable. Under the judgment as rendered they pay only once. With one exception the judgment follows the statutory provisions. The exception to which we refer is the provision that the damages “ * * * shall be so apportioned in the judgment that the *156 claim of the employer for the compensation actually paid shall take precedence over that of the injured employee.” Here only the intervenor has any interest in this matter of preference and it is satisfied with the judgment as rendered. We therefore make no change in this portion of the judgment.
Appellants’ third and fourth contentions are concerned with the awards to plaintiff for personal injuries and future medical expenses. The trial court granted the lump sums, without itemization, of $11,000 for disability, pain and suffering and $1,500 for future medical expenses. The contentions are that the award for personal injuries is excessive and that there should he no award for future medical expenses. We are in agreement with both contentions.
The evidence relative to personal injuries consists solely of the testimony of plaintiff and the reports, introduced by stipulation, of Carlisle’s medical experts, Dr. Frank V. Mayer (the treating physician), Drs. J. A. Colclough and Raeburn C. Llewellyn (neurosurgeons), Dr. Henry M. Duhe (radiologist), and Edmond B. Story, Jr. (physical therapist). None of these experts testified.
Plaintiff testified: Following the accident he had pains in the lower part of his neck. He consulted Dr. Mayer, his family physician, who examined him, ordered x-rays and recommended physiotherapy and home treatment consisting of aspirin, relaxing at work, hot baths before bed and upon arising, and the use of a heating pad. Therapy consisted of neck traction, with each treatment lasting 20 to 30 minutes. The treatments were very uncomfortable but following each he did experience some relief for several days. He received 56 such treatments. Sometime after the accident he experienced a loss of circulation from the fingertips through the hands. These were the only two areas of the body where he had difficulty which he relates to the accident.
At the time of trial (November 9, 1967) he complained of periodic difficulty with his neck, the latest attack being only" a week or two earlier, which he characterized as the worst he had had. His problem with circulation is constant. He loses complete feeling in both hands to the extent that at times he cannot hold a pencil. For six or eight months after the accident he continued to drive a truck but because of the condition of his hands he was given a clerical job by his company at the same salary. His • only testimony relative to future medical treatment was elicited by the trial judge who asked whether further medical treatment was contemplated. Plaintiff’s response was “I have one Monday coming up.”
The report of Dr. Frank V. Mayer, the treating physician, states he examined plaintiff three days after the accident. At that time Carlisle was in considerable pain due to the neck injury. He told the doctor he had felt no pain immediately after the accident but later that evening noted the onset of occipital headache and pain along the left side of the neck radiating to the left upper shoulder area. These symptoms grew progressively worse causing him to seek medical treatment. The doctor found marked limitation of motion to the left and right with moderate limitation of flexion and extension and tenderness along the posterior cervical musculature and upper border of the left trapesius muscle. However, there was a normal range of motion of the arm and shoulder joints. (We note that x-rays of the skull and cervical spine taken by Dr. Duhe the following day at Dr. Mayer’s request were essentially negative.) Dr. Mayer’s diagnosis was hypertension flexion injury of the cervical spine. Treatment consisted of medication and ultrasound treatments (apparently at the doctor’s office) at frequent intervals during October. Improvement was noted to the extent that on November 30, 1965 the headaches were not as severe as previously experienced and medication was needed only occasionally. He was seen by this doctor during October and November and in December, 1965.
*157 When seen again on April 16, 1966, slightly more than six months after the accident, plaintiff had a multiplicity of complaints referrable to the upper extremities associated with listlessness and the intermittent experiencing of numbness and tingling in the arms and hands. The doctor thought these symptoms were either on a circulatory or nerve root irritation basis. With reference to them he was referred to Dr. J. A. Colclough and later to Dr. Rae-burn C. Llewellyn. As has been pointed out, both of these doctors are neurosurgeons. Treatment consisted of Vasodilan, Pro-tamide B-12 injections and heat locally.
On July 22, 1966 plaintiff advised the doctor he had a flareup of pain in the posterior cervical and upper thoracic area while on a trip to New York several weeks earlier. He was referred to the New Orleans Physical Therapy Clinic. It is not clear whether the doctor conducted an examination on this date; if so, his reports do not contain the results thereof.
When seen on September 7, 1966 plaintiffs symptoms were suggestive of car-diospasm and treatment was rendered. An EKG was negative. A year later, on September 7, 1967, plaintiff advised the doctor he had stopped therapy (for the neck) on September 1, 1967 and his complaints on the 7th were of intermittent pain in the interscapular area down to the lumbar paravertebral muscle area, disappearing for as long as three days but recurring for one or two days.
Examination of September 18, 1967 revealed a normal range of motion of the cervical thoracic and lumbar spine clinically. No deformities or areas of tenderness were noted. (X-rays were made by Dr. Duhe of the cervical, dorsal and lum-bosacral spine. His findings were essentially negative. Comparison of x-rays of the cervical spine at this time with x-rays made in October, 1965 shortly after the accident, indicated no changes. There being no complaint re the dorsal or lumbar spine in 1965, there were no comparable x-rays.)
On September 20, 1967 plaintiff complained to Dr. Mayer of loss of feeling in the hands and arms intermittently. Physical examination was negative. Following treatment in the form of vasodilator drugs and vitamin B-12 he improved to the extent the doctor felt further treatment or evaluation was unnecessary. Dr. Mayer concluded plaintiff had reached maximum benefits (apparently as to the cervical condition) and would be seen thereafter only as indicated by future symptoms.
Two days after the date of this final report Dr. Mayer wrote a letter stating that plaintiff had been receiving intravenous injections of Niacinamide and B-12 for the past several weeks and he advised continuation of such treatment for an indefinite period. Depending on the nature of his symptomatology this same routine would be continued or additional therapy instituted.
We have carefully read Dr. Mayer’s reports and note that as plaintiff’s family physician he has been consulted about a variety of complaints on various occasions following the accident, including: (1) injury to the cervical spine (October, 1965) ; (2) infected toenail (December, 1965); (3) listlessness referrable to complaints of the upper extremities involving numbness and tingling of the arms and hands intermittently, thought by the doctor to be circulatory or nerve root irritation basis (April 16, 1966); (4) posterior cervical and upper thoracic area problems (July 22, 1966); (5) cardiospasm; and (6) interscapular and lumbar paravertebral muscle complaints (September 7, 1967).
Dr. J. A. Colclough’s report states: He examined plaintiff on April 27, 1966 at which time the chief complaints were tingling, loss of circulation or going to sleep of both hands, occasional shocks in both upper extremities and occasional pain in the neck. A history was taken and a neurological examination performed; the latter was essentially negative. It was noted the patient’s hands were blanched and cold. *158 Dr. Colclough’s diagnosis was neck sprain and Raynaud’s disease. He concluded plaintiff had apparently almost entirely recovered from neck sprain. A muscle relaxant, a vasal dialator and wearing gloves at all times was prescribed for the disease. The possibility of surgical intervention, if necessary, to overcome the effects of the disease was discussed with plaintiff. The doctor stated, “I do not know whether any causal relationship exists or not as to the trauma he suffered being related to the Raynaud’s disease * * * »
Dr. Raeburn C. Llewellyn’s report states: He saw plaintiff on June 2, 1966 at the request of Dr. Mayer because of positional numbness and tingling of the upper extremities. His examination was neurologically within normal limits. He noted hyper-extension movements of the neck resulted in a complaint of some soreness but he found no muscle spasm or unusual tenderness to palpation. It was Dr. Llewellyn’s opinion that plaintiff was experiencing achroparesthesias, or so-called positional numbness of the extremities, “which admittedly could well have been initiated” by the cervical spine injury he had experienced.
The report of the physical therapist, Edmond B. Story, Jr., indicates plaintiff was referred to him on August 10, 1966 for treatment of cervical sprain syndrome. Treatment consisted of moist heat packs, cervical head halter traction and massage. There was gradual remission of pain and on November 2, 1966 therapy was discontinued. On March 14, 1967 due to exacerbation of pain and tension in the posterior cervical spine musculature plaintiff returned for further therapy. He received treatments two to three times per week during the next six months. An improvement plateau was reached in September, 1967 and he was referred back to Dr. Mayer for examination and evaluation, following which therapy was discontinued.
Thus it is clear that Carlisle seeks to recover for two conditions which his counsel argues were caused by the accident in suit, the cervical spine injury and the problem with his hands, diagnosed by Dr. Colclough as Raynaud’s disease and referred to by Dr. Llewellyn as achropares-thesias. It is also clear that the sum of $11,000 awarded by the trial court for disability, pain and suffering includes both conditions. For, with the exception of pain and discomfort relative to the neck, which Carlisle testified continued to be present at the date of trial, the record establishes no disability except such as may result from Raynaud’s disease or achro-paresthesias.
Our settled jurisprudence is that in a suit for personal injuries the plaintiff bears the burden of proving his claim to a legal certainty by a preponderance of the evidence and this includes the burden of offering sufficient proof that the injuries complained of were caused, precipitated or accelerated by the accident in suit. Hughes v. Travelers Insurance Co., La.App., 195 So.2d 745; Williams v. Bologna Bros. Inc., La.App., 194 So.2d 131; Carles v. Hartford Accident and Indemnity Company, La.App., 184 So.2d 261; Ernest v. Tac Amusement Co., La.App., 163 So.2d 818; Guillory v. New Amsterdam Casualty Company, La.App., 141 So.2d 493; Bryant v. Johnson, La.App., 140 So.2d 758; Roberts v. M. S. Carroll Co., La.App., 68 So.2d 689; Pinkney v. Cahn Inv. Co., La.App., 32 So.2d 345. In this case we are satisfied Carlisle has proved with sufficient legal certainty that the cervical spine injury was caused by the accident. But we feel otherwise about the condition of his hands.
The three physicians whose reports are part of the record, which reports are the only possible source of evidence on the question now under discussion other than the testimony of Carlisle who does relate the hands complaint with the accident, were physicians of his choice; his family physician referred him to the two specialists. There is nothing in Dr. Mayer’s reports which indicates whether or not he believes *159 Carlisle’s complaints of tingling, numbness and loss of feeling in the hands are in anyway related to the accident. Dr. Colclough did not know whether there was any causal relationship between the trauma sustained in the accident and the Raynaud’s disease which this doctor diagnosed. Dr. Llewellyn, who described the condition as achroparesthesias, was of the opinion that the positional numbness could have been initialed by the cervical injury. Although we are aware of the not unusual tendency of medical experts to avoid definitive conclusions, we note that this doctor stated in his report no more than that it was quite possible the hands condition had been caused by the accident; the report does not state that it was caused by the accident.
One sentence contained in Dr. Llewellyn’s report may be significant. That sentence reads as follows: “In 3-4 weeks the muscular soreness in the cervical area resolved and it was at this point or perhaps two months after his accidental injury that he noticed gradual, but progressive, episodes of numbness and tingling of the fingers and hands.” Apparently this is part of the history given to Dr. Llewellyn by Carlisle and accepted by the doctor as correct. However, although Carlisle saw his treating physician, Dr. Mayer, on many occasions in connection with the accident and on one other unrelated incident during the two months immediately following the accident, he made no complaint to Dr. Mayer about the hands condition until slightly more than six months after the accident. We are satisfied that if Carlisle had experienced the trouble with his hands during the time Dr. Llewellyn was under the impression it had been experienced, he would have informed Dr. Mayer of that fact. Principally due to the absence of medical testimony, we do not know that the difference between three or four weeks, or two months, and six months after the time of the accident would be considered by Dr. Llewellyn as significant insofar as the question of whether the accident caused or contributed to the condition of Carlisle’s hands. However, it could be significant and might change this doctor’s opinion as to the possible cause. Dr. Llewellyn’s report does not state why he feels the accident was a possible cause of the achroparesthesias; nor does the record reveal the underlying cause of the trouble or that there is any difference between Dr. Llewellyn’s finding of achroparesthesias and Dr. Colclough’s diagnosis of Raynaud’s disease. It may be that the underlying cause of the condition is not entirely clear to medical science. In any event, considering the medical reports of the three doctors we are convinced that Carlisle has failed to carry his burden of proving that the condition of his hands was caused, precipitated or accelerated by the accident. Accordingly, he cannot recover for that condition; he can only recover for the cervical spine injury.
We find that Carlisle sustained a hypertension flexion injury to the cervical spine which required frequent treatment for two months thereafter. He returned to his treating physician in April, 1966, a period of six months after the accident, with a multiplicity of complaints referrable to the upper extremities. When examined by Dr. Colclough on April 27, 1966 that neurosurgeon found that he apparently had almost entirely recovered from the neck sprain. However, in late June or early July, 1966 Carlisle experienced a flare-up of posterior cervical and upper thoracic problems for which he was referred to the New Orleans Physical Therapy Clinic by Dr. Mayer. He received head halter traction at the clinic beginning August 11, 1966 and frequently thereafter until November 2, 1966, when sufficient remission had occurred to warrant discontinuation of therapy treatment.
On March 14, 1967 continued therapy and head halter traction again was resumed two or three times each week for six months when plaintiff reached an improvement plateau in September, 1967 at which time therapy was discontinued. Physical examination on September 18, 1967 was asymptomatic as relating to the cervical *160 problem and his treating physician was of the opinion Carlisle had reached maximum benefits. However, he was still suffering from considerable pain and discomfort at the time of trial, November 9, 1967. And he had experienced another flare-up just a week before that time.
Considering the extraordinary length of time Carlisle has been troubled by the cervical spine injury, the flare-ups he has experienced and the numerous times he has been required to undergo difficult physical therapy, we are of the opinion that he should be awarded the sum of $5,000 for the cervical spine injury. For awards in somewhat similar cases see Harney v. Kountz, La.App., 218 So.2d 913, handed down on February 3, 1969. Dupuy v. Southern Farm Bureau Casualty Ins. Co., La.App., 212 So.2d 484; Zager v. Allstate Insurance Company, La.App., 211 So.2d 744; Harris v. Travelers Insurance Company, La.App., 207 So.2d 891; Mouton v. Continental Insurance Company, La.App., 196 So.2d 684; Williams v. Bologna Brothers, Inc., La.App., 194 So.2d 131; Morgan v. Whittington, La.App., 191 So.2d 911; Hester v. Stewart, La.App., 177 So.2d 430; Poleman v. Employers Liability Assurance Corp., La.App., 164 So.2d 630.
We must disallow the award of $1,500 to Carlisle for future medical expenses. The only evidence on this subject is Carlisle’s testimony that he was still receiving medical treatment and Dr. Mayer’s report of November 8, 1967 in which the doctor stated Carlisle had been receiving intravenous injections of Niacinamide and B-12 for the past several weeks and advised continuation of such treatment for an indefinite period. As the treatment to which Dr. Mayer refers appears to be related only to Carlisle’s complaints relative to the hands, for which we have decided he cannot collect damages, it follows that neither can he collect future medical expenses for that condition. In addition, the record contains no evidence as to the cost of future medical treatment or of the possible length of the same. Thus, even if future treatment was indicated for the cervical spine injury, future medical expenses would have to be denied as being too speculative and conjectural. Brooks v. Kirkpatrick, La.App., 175 So.2d 342; Roy v. United Gas Corporation, La.App., 163 So.2d 587; Dowden v. Southern Farm Bureau Casualty Ins. Co., La.App., 158 So.2d 399; Smith v. Aetna Casualty & Surety Company, La.App., 128 So.2d 235; Carhee v. Scott, La.App., 104 So.2d 236.
For the reasons assigned, the judgment appealed from in “William J. Carlisle, Jr. v. Employers Mutuals of Wausau, et al.”, No. 3,289 of our docket, is amended so as to reduce the total award to the plaintiff in that suit, William J. Carlisle, Jr., from $12,500 to $5,000. As thus amended, and in all other respects, that judgment is affirmed.
The judgment appealed from in “Texaco Inc. v. Young Sales Corporation, et al.”, No. 3,290 of our docket, is affirmed.
In both suits all costs in this court are to be paid by the defendants-appellants.
Amended and affirmed.