SAMUEL, Judge.
This is a suit for personal injuries and medical expenses resulting from an automobile accident. Plaintiff was a guest passenger in one of the two cars involved. Her petition prays for an in solido judgment against Jan T. Patterson, driver of the vehicle in which plaintiff was a passenger, Traders & General Insurance Company, liability insurer of the Patterson vehicle, Elbert E. Lemley, driver of the other vehicle, and Lemley’s liability insurer, The Aetna Casualty & Surety Company.
The case was tried to a jury. After trial judgment was rendered, in accordance with the jury’s verdict, in favor of plaintiff and against Patterson and Traders & General, in solido, in the sum of $2,000, and in favor of Lemley and Aetna and against the plaintiff, dismissing her suit as to the latter two defendants. The $2,000 award includes proven medical and other expenses to the extent that, in round figures, the amount awarded for pain and suffering is $1,500.
Plaintiff has appealed. In this court appellant contends she is entitled to a judgment against Lemley and Aetna, alone or at least in solido with the other two defendants, and that the $2,000 award is inadequate.
The evidence relative to the occurrence of the accident consists of the testimony of plaintiff, the two defendant drivers, the investigating deputy sheriff, a professional photographer and various documentary exhibits. The jury resolved the factual issues in favor of Lemley and Aetna, accepting their version of the accident. The record fully supports that jury action by a clear preponderance of the evidence. As we find them and, we are satisfied, as the jury found them, the pertinent facts relative to the accident are:
It occurred In the Parish of Jefferson on Veterans Highway, a major thoroughfare, at approximately 2 p. m. on September 4, 1966 during a light rain. At that time Veterans was a four-lane highway, divided by a neutral ground, with two lanes for westbound and two for eastbound traffic. The Patterson automobile in which plaintiff was a passenger had been driven from the westbound lanes of Veterans several feet off the north shoulder of the highway into the driveway of the Elmwood Plantation Apartments. It was stopped across the driveway and parallel to the highway, facing west. The driver, Mrs. Patterson, testified she looked to the rear, observed approaching traffic, and after deciding that traffic was sufficiently far away, proceeded at a speed of between 20 and 25 miles per hour diagonally into the highway, crossing the nearer lane and entering the neutral ground lane for the purpose of later making a U-turn. She ran into the path of the Lemley vehicle which was traveling in the westbound lane next to the neutral ground at a speed of approximately 35 miles per hour, within the 40 mile speed limit. Lem-ley applied his brakes in an effort to avoid the accident but the right front of his car collided with the left rear fender of the Patter son automobile. Thereafter the Lem-ley automobile came to a stop in the neutral ground and the Patterson car came to a stop on the opposite or south side of the neutral ground some distance west of the *822 point of impact. Both drivers testified they did not see the other vehicle until immediately before the collision.
Under these facts it is quite clear the accident was caused solely by the negligence of Mrs. Patterson in performing only part of her duty by looking to the rear, in failing to see what she should have seen (that the Lemley car was too close to permit a safe entry into the neutral ground lane ahead of that automobile), and in suddenly proceeding from a stopped position directly into the path of the Lemley vehicle. We are satisfied there was no negligence on the part of Lemley; the Patterson vehicle was driven into his path so unexpectedly, so suddenly, and a such a short distance in front of his car he was unable to avoid the collision. Dane v. Canal Insurance Company, 240 La. 1038, 126 So.2d 355; Danos v. Forsythe, 205 So.2d 821; Lucas v. Broussard, La.App., 197 So.2d 696; Gauthreaux v. Hogan, La.App., 185 So.2d 44; McMorris v. Hanover Ins. Co., La.App., 175 So.2d 697.
Testimony relative to the nature and extent of plaintiff’s injuries was given by the plaintiff, her employer, and Drs. Philip P. LaNasa, a general practitioner and the treating physician, Raeburn C. Llewellyn, a neurosurgeon, Robert J. Cangelosi, an ophthalmologist, Hyman R. Soboloff, an orthopedic surgeon and Irvin Cahen, also m orthopedic surgeon. Dr. Cahen was called by Traders & General; the remaining physicians were called by the plaintiff.
Plaintiff testified she had been in the front seat next to the driver when the collision occurred. The impact threw her forward and then back, striking her hip against the door to her right. Two days later she saw Dr. LaNasa and she has been under the care of physicians continuously since that time. She missed only three days from her secretarial work but managed to accomplish this by forcing herself to work in pain and discomfort because she is the sole support of herself and her children; there was only one other secretary in the office; and she was then a relatively new employee. She was treated by Dr. LaNasa for about nine months, seeing him twice a week for the first three months and once a week thereafter. He prescribed heat therapy, consisting of tub baths and the use of a heating pad, and medications. She has suffered severe pain in her neck and at the base of her head, causing headaches over her eyes, continuously since the accident to the time of trial slightly less than one and one-half years later. Dr. LaNasa referred her to the specialists other than Dr. Cahen.
The testimony of plaintiff’s employer generally corroborates plaintiff regarding the difficulties she had doing her work following the accident as compared with the easier and more efficient manner she performed the work prior to that time.
Dr. LaNasa’s testimony was as follows: He first saw plaintiff on September 6, 1966 and her last visit was on May 30, 1967. Between those dates she was seen by him approximately 43 times. She complained of posterior neck pain with radiation toward the skull and mid-back which was associated with headaches. An area over her right buttocks was tender and sensitive with observable discoloration. The bruise on her buttocks was treated for 7 to 8 weeks. When he first saw her, and for some time thereafter, pressure on the involved muscles elicited pain and tightness or spasm and she could not fully perform movements which she was instructed to do, indicating a restricted range of motion of her neck due to the fact that muscles had been injured. This condition persisted for at least six months. There was some involvement of her nerves and arteries including the carotid artery. He explained that the healing process for muscle damage is scarring which is permanent and subject to causing future difficulty because of shortening of the muscle; with such an injury it is not unusual to experience pain for a year to a year and a half and some may have trouble *823 indefinitely. He also said that such scarring causing spasms can affect the normal lordotic curve of the cervical vertebrae so that the curve will be flattened out and x-rays indicate that this is a condition existing in plaintiff’s neck. He described his treatment principally as medication for pain, for absorption of bleeding into the tissues, for healing the muscle and relieving spasm. He did not use muscle relaxant injections because of plaintiff’s phobia of shots, and diathermy was not given because of her inability to take time off from work.
The neurosurgeon, Dr. Llewellyn, testified: He examined plaintiff on November 29, 1966 at the request of Dr. LaNasa because of headaches which had followed the accident and had persisted thereafter. There was spasm of the lateral cervical muscle on the left, an objective finding, which resulted in his diagnosis of a cervical spine sprain. In connection therewith he suggested that she be treated by a physiotherapist after further x-ray examination. He also found that palpation of the muscles at the base of the skull reproduced or aggravated her headache complaints. His findings were negative from a neuro-surgical point of view, plaintiff’s condition being referrable to muscles and ligaments. He stated that the muscle spasm at that time was mild, there was a normal range of cervical spine motion, and he felt that with passage of time and treatment for cervical spine sprain plaintiff should make an uneventful recovery without residual disability. *
Dr. Cangelosi, the ophthalmologist, testified he had seen plaintiff on February 7 and 21, 1964, prior to the accident, as an eye patient with complaints of difficulty after reading. The examinations revealed she did not need glasses, eye drops were prescribed, and on the second examination her difficulty had subsided. He saw her next on January 9, 1967, after the accident, at which time she informed him she was undergoing treatment for a whiplash injury and had been advised to consult him particularly about her severe headaches in the area of the eyes. His examination on that visit revealed spasm of the ciliary muscle which focuses the near vision. He stated that with patients having subjective symptoms, particularly with reading and especially where there is normal refraction and no other problem, these symptoms are caused by what is commonly termed whiplash injuries. Because of such injuries the pulling and stretching of neck muscles can stretch the carotid artery; and as the nerves of the automatic nervous system supplying the eyes are closely related to that artery, visual difficulty results. It was his opinion that plaintiff’s complaints of headaches, spots in front of her eyes and blurring of vision were caused by spasm of the muscles controlling the eyes as a result of the accident. In order to relieve her symptoms he prescribed drops to dilate the pupils and paralyze the muscle of accomo-dation which had spasm. In addition to the January 19, 1967 visit, he saw plaintiff on February 20 and March 6, 1967, on which latter date she was free of symptoms although she still complained of occasional headaches and blurring of vision. His last examination of the plaintiff was made one week before the trial began and at that time he found she remained free of symptoms.
Dr. Soboloff, the orthopedic surgeon, saw plaintiff on January 9, 1968, approximately fifteen months after the accident. She complained of neck pain and headaches. This doctor’s examination of the x-rays which had been taken showed a loss or flattening out of the lordotic curve, indicative of cervical sprain or strain. At that time he found no signs of tearing or bleeding into the muscles. He stated that plaintiff’s continued complaints at the time of his examination could have been a result of the accident.
Dr. Cahen, the orthopedic surgeon who saw plaintiff at the request of Traders & General, made his examination on June 27, 1967. X-rays revealed no fracture or dislocation. He found no spasm, atrophy or wasting of the muscles of the shoulder or *824 neck, or abnormal reflexes and considered her motions under examination to be within normal range for her general body build. He found no objective orthopedic abnormalities and stated he considered plaintiff’s symptoms to be in excess of his findings. However, he conceded that the replacing of elastic muscle fibers by scarring will cause tightening and that the x-rays did show some flattening of the lordotic curve, an indication of such tightening.
During the trial, with the sole exception of Dr. Soboloff, counsel for Traders & General objected to plaintiff’s medical witnesses being allowed to testify on the ground that prior to the filing of suit plaintiff had refused to undergo a medical examination by a physician of that defendant’s choice. Those objections were overruled. However, at the request of Traders & General the trial judge gave the following instruction to the jury, which instruction appellant contends had an unwarranted prejudicial effect on the verdict insofar as quantum is concerned:
“I wish to first instruct you that a person is not required by law to submit to a physical examination prior to institution of a lawsuit. However, when a person so refuses upon the request of the other party, his insurer representative, any medical testimony offered at the time of the trial by the person refusing to take the physical examination covering the period prior to the' date suit was filed must be weighed by you accordingly.”
The instruction was given under the jurisprudential rule that in a suit for personal injuries refusal by the plaintiff to submit to a reasonable medical examination requested by the defendant before the suit is filed throws grave doubt upon, and affects the weight to be given to, the medical evidence offered by the plaintiff relative to the injuries in suit. Kennedy v. New Orleans Ry & Light Co., 142 La. 879, 77 So. 777; Grant v. New Orleans Ry. & Light Co., 129 La. 811, 56 So. 897; Boudreaux v. Travelers Insurance Company, La.App., 212 So.2d 534; see also Daste v. First Nat. Life, Health & Accident Ins. Co., 14 La.App. 565, 130 So. 572.
The defendant in such a case being unable to compel the plaintiff to submit to a medical examination prior to institution of suit, the basis for the rule is that such refusal materially prejudices the defendant by depriving him of an opportunity to obtain countervailing evidence relative to the nature and extent of the injuries, thus interfering with the defendant’s right to due process. The reason for the rule is expressed in Kennedy v. New Orleans Ry. & Light Co., supra, at page 883 of the Louisiana citation and page 778 of the Southern citation, as follows:
“We find no fault with the ruling of the trial judge to the effect that he was without authority to require plaintiff to permit an examination of her person; but, on the other hand, we do not see how the jury and the judge could reach a legal verdict and judgment against the defendant upon an ex parte version of physical injuries, of the nature and character of which plaintiff permitted only the witnesses selected by herself to become informed; for, if defendants in such cases can be condemned upon that basis, they will always be at the mercy of the plaintiffs, who have only to complain of injuries not visible outside of their clothing, produce théínselves and their own selected witnesses to testify to them, and sit tight, with no fear of possible contradiction. Such a proceeding, however, fails to furnish the principal element required in due process of law, to wit, a hearing, and ordinarily would be dismissed, since a court cannot well place a value upon ex parte testimony.”
In the instant case the accident occurred on September 4, 1966. Traders & General knew of that occurrence within 10 days thereafter. On January 6, 1967 insurance *825 adjusters representing Traders & General wrote a letter to plaintiff’s counsel requesting that plaintiff submit to an examination by Dr. Irving Redler, a local orthopedic surgeon, on January 25, 1967. On January 18, 1967 counsel for plaintiff answered that letter refusing the request, apparently because of prior disagreements with the adjusters involved. The suit was filed on February 13, 1967, approximately five months after the accident had occurred and nineteen days after the date of the requested examination. Traders & General made no further attempt to obtain an examination until that defendant’s counsel requested the examination made by Dr. Cahen, to which plaintiff immediately and voluntarily submitted. As we have noted, Dr. Cahen’s examination was made more than nine months after the accident.
We find the rule has no application here. Under the provisions of LSA-C.C.P. Art. 1493 Traders & General could have obtained a medical examination of plaintiff by court order at any time after February 13, 1967, the date on which the suit was filed. The record contains no showing that Traders & General was in any way prejudiced by the short interval between the time of the first requested examination, January 25, 1967, and the date that defendant could have obtained an examination by court order; and we are convinced Traders & General was not prejudiced by plaintiff’s refusal to submit to the requested February 25, 1967 examination. Accordingly, under the particular facts present here, we hold that plaintiff’s refusal to submit to the medical examination requested prior to the institution of this suit does not affect the weight to be given to her medical evidence.
We find that as a result of the accident plaintiff sustained a cervical spine sprain and a severe bruise of the right buttocks. In addition, and also as a result of the accident, she had visual difficulties which caused severe headaches, spots in front of her eyes and blurring of her vision for a period of at least six months. The bruise required treatment for 7 or 8 weeks and treatment for the sprain was required for approximately nine months.
With regard to quantum for personal injuries, it is not established that each case must be decided largely on the facts and circumstances surrounding the particular injuries involved and that amounts of awards in similar cases are relevant only for the purpose of determining whether the award is so excessive or so inadequate as to constitute an abuse of the “much discretion” vested in the trial judge or jury by LSA-C.C. Art. 1934(3). Gaspard v. LeMire, 245 La. 239, 158 So.2d 149; Ballard v. National Indemnity Company of Omaha, Neb., 246 La. 963, 169 So.2d 64; Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127; Thibodeaux v. Travelers Indemnity Company, La.App., 215 So.2d 215; Luquette v. Bouillion, La.App., 184 So.2d 766.
In this connection we have examined other cases involving somewhat similar injuries. These cases include: Trahan v. Lewis, La.App., 223 So.2d 511, handed down May 5, 1969; Carlisle v. Employers Mutual of Wausau, La.App., 220 So.2d 152; Harney v. Kountz, La.App., 218 So.2d 913; Zager v. Allstate Insurance Company, La.App., 211 So.2d 744; Harris v. Travelers Insurance Company, La.App., 207 So.2d 891; Morgan v. Whittington, La.App., 191 So.2d 911; Poleman v. Employers Liability Assurance Corp., La.App., 164 So.2d 630.
We conclude that the $1,500 award for plaintiff’s injuries alone is so inadequate as to constitute an abuse of the “much discretion”. We further conclude that an award of $5,000, which will include her special damages, will adequately compensate the plaintiff.
For the reasons assigned, the judgment appealed from is amended so as to increase the amount awarded from the sum of $2,000 to the sum of $5,000. As thus amended, and in all other respects, the judgment ap *826 pealed from is affirmed; costs of this appeal to be paid by defendants Jan T. Patterson and Traders & General Insurance Company.
Amended and affirmed.