BOUTALL, Judge.
This is a suit for personal injuries and damages arising out of an automobile accident wherein plaintiff’s vehicle was struck from the rear. Prior to trial by jury, the defendants admitted liability and insurance coverage, and the only issue before the jury was the extent of the injuries and amount of the damages to be awarded. The jury returned a general verdict in the sum of $25,000.00, and the trial court entered judgment accordingly. From this judgment the defendant has taken a sus-pensive appeal.
On this appeal the appellant has specified the following errors and issues presented for review:
(1) The district court erred in permitting Dr. Blaise Salatich to testify as an expert orthopedist;
(2) The district court erred in rendering judgment on the basis of an excessive jury verdict;
(3) The district court erred in failing to give certain of appellant’s requested jury instructions.
QUALIFICATIONS OF DR. SALATICH
An examination of the record reveals that an assessment of the extent of personal injuries will involve in large part the weight to be given the testimony of Dr. Salatich, and for this reason it is well to consider at the outset whether he should be permitted to testify as an expert. The ap *745 pellant has urged to us the following statements which are based upon the record herein:
“Cross-examination of Dr. Salatich revealed, as it had on so many occasions in the past, that:
“1. Dr. Salathich is not a member of and is not certified by the American Board of Orthopedic Surgeons (R. 82), because he failed part two of the Board’s examination and was not permitted to take it thereafter;
“2. That the reason he failed the oral test was because he was ill and had mental 'block’, rather than a mental blackout, as variously reported. (R. 95)
“3. That it was not true that he failed the exam twice, as he had testified in the case of Smith v. W. Horace Williams Co., Orl., App., 1956, 84 So.2d 223. (R. 98);
“4. Dr. Salatich testifies in Court on an average of twenty-four (24) times a year; always for the plaintiff;
“5. Dr. Salatich stated he ‘won’ more cases that he ‘lost’. (R. 104)” (Emphasis supplied)
Counsel further urges to us that the doctor has become a professional witness on behalf of plaintiff and has referred us to a great number of cases covering the years 1952-1971. Additionally, he refers us to a number of specific cases in which the court directly commented upon the testimony of Dr. Salatich. We have examined the cited cases, most of which arose from this court and can only remark that based upon the facts as presented in those cases, the remarks were probably justified. However, as we remarked in Barrere v. Commercial Union Insurance Group, 195 So.2d 461 (La.App. 4th Cir., 1967):
“We hold no brief for Dr. Salatich. He has appeared as a witness in many cases, coming before this Court on appeal and we know from experience that he is likely to over emphasize and overstate the nature and extent of the plaintiff’s injuries. But his testimony must be accepted when the same appears to be true and correct. Id. at 465.” (Emphasis supplied)
We also refer to the statement of our brothers in the case of Carr v. Fidelity and Casualty Company of New York, 248 So.2d 917 (La.App. 3rd Cir., 1971). The court in that case considered the same basic facts of qualifications as herein related and permitted the doctor to testify as an expert saying:
“ * * * An appellate or trial court’s conclusion as to Dr. Salatich’s fairness and competence must be based on the testimony in the record presented in that case. * * * ” (id. at p. 920)
We believe the following to be the law pertinent to the qualification of a witness as an expert witness, LSA-R.S. 15:464, 465 and 466:
“§ 464. Expert testimony
“On questions involving a knowledge obtained only by means of a special training or experience the opinions of persons having such special knowledge are admissible as expert testimony.”
“§ 465. Statement by expert of fact basis of opinion
“Every expert witness must state the facts upon which his opinion is based.”
“§ 466. Qualification of experts
“The test of the competency of an expert is his knowledge of the subject about which he is called upon to express an opinion, and before any witness can give evidence as an expert his competency so to testify must have been established to the satisfaction of the court.”
The courts of this state have repeatedly held that the trial court is vested with much discretion in determining whether a witness is qualified to testify as *746 an expert. Hargis v. Travelers Indemnity Company, 248 So.2d 613 (La.App. 3rd Cir., 1971); Bonilla v. Arrow Food Distributors, Inc., 202 So.2d 438 (La.App. 4th Cir., 1967); State, Department of Highways v. Williams, 170 So.2d 152 (La.App. 2nd Cir., 1964); Carvell v. Winn, 154 So.2d 788 (La.App. 3rd Cir., 1963). We find no abuse of discretion in the ruling of the trial judge, who properly permitted the witness to testify as an expert.
EXTENT OF INJURIES AND DAMAGES
The jury returned a verdict in favor of Mrs. Fox in the amount of $25,000.-00. Because it is a jury verdict, and does not apportion the award, there is no way to tell precisely what the jury assessed this award upon. There were 3 major bases for recovery sought, that is, personal injuries to Mrs. Fox, her loss of earnings, and her medical expenses and physical damage.
The first issue herein is the extent of the personal injuries suffered by Mrs. Fox. Her automobile was struck from the rear on August 1, 1968, and at that time she experienced no particular pain. However, that night and the next day she began to experience more and more pain and finally called her family doctor. Because he was out of town and because of the intervening weekend, she did not actually visit the doctor until August 6, 1968. On that date she saw her family physician, Dr. John J. Gordon, who related that she complained of pain in the neck primarily on the right-back of the neck, and radiating out to the right shoulder. She also complained of head pains and headaches. He found that she had a fair amount of tenderness throughout the neck region and that although she had full neck motion, she had lots of pain with it. He ordered X rays which were reported to be negative for fracture, dislocation or inflammatory disc. He began treating her with muscle relaxants, pain relievers and diathermy. By August 12, her pain had increased to the point where her ability to raise her head up and turn her head were practically zero with much pain. He then ordered a neck halter which Mrs. Fox was to wear throughout the day. He saw her from time to time at approximately weekly intervals and noted that in September her pain began to lessen and she achieved more and more motion without discomfort. By the end of October, Mrs. Fox had only occasional pain and had considerably improved to the extent that Dr. Gordon told her to begin to try her sewing again. (She made her living as a steamstress, sewing for various individuals.) She continued to improve throughout November and December and into January, 1969. The last time Dr. Gordon saw her for this injury was on January 30, 1969, at which time he reported that “she said that she had no complaints in general concerning the neck, except that on days she worked for too long, she experienced pain on the right side; she did have some tenderness there.” At this time Dr. Gordon felt that he had given a maximum benefit that he could to the patient for this, and suggested to her that if the neck bothered her any more, he would recommend seeing an orthopedist. He expected at that time that she may experience some future pain, but that it would be of no serious consequence.
Dr. Gordon further testified that he saw her again on May 18, 1971, for an injured ankle. Although it was not the primary purpose of her visit, he discussed with her at that time her neck problem and was told that she was still suffering pain in the neck area. At that time he found that she had a full range of motion, but that there was discomfort in her neck.
Mrs. Fox saw no doctors from January 30, 1969, until June 25, 1969, at which time she was referred to Dr. Salatich by her attorney. She complained to Dr. Salatich that she still suffered pain and discomfort in her neck. She described to the doctor that she experienced numerous bad spells of increased headaches, pain, stiffness in her neck, weakness and dizziness lasting 2 to 7 *747 days, and that this usually followed increased physical activities, such as sewing or working in her garden, or changes in the weather. She also related at this time that she was just getting over one of these bad spells. Dr. Salatich gave her a complete orthopedic examination and had X rays taken of the pertinent area. The X rays again proved negative, but the doctor did determine that there was moderate mort tenderness and there was a visible comfortable degree of muscle spasm throughout the posterior and lateral cervical region bilaterally, or more on the right side. He recommended that she wear the collar which Dr. Gordon had prescribed daily, and adjusted the collar for her to make her more comfortable. He also recommended that she resume her medication, and take heat treatments, restrict her physical activity and return to his office for treatment at frequent regular intervals to receive physiotherapy, which in her case utilized short wave diathermy.
Mrs. Fox was seen by Dr. Salatich over a period of time, and in fact he was still treating her at the time of his last examination up to the date of trial. The doctor testified that at a number of times she presented increased symptomatology, at which time she had more pain, limitation of motion, and muscle spasm. Shortly before the trial date, on April 21, 1971, he again gave Mrs. Fox a thorough examination and referred her to Dr. Joe V. Hopkins, radiologist, for X rays in connection therewith. Whereas prior X rays had demonstrated no positive findings, the X rays taken at this time demonstrated an asymmetry of the odontoid process of the neck. He testified that the X rays demonstrated a subluxation or slipping forward of the bodies of the second cervical vertebra on the third cervical vertebra, the third cervical vertebra on the fourth, etc., which he felt indicated that her condition was getting worse. This asymmetry of the odontoid process was also reported by Dr. Hopkins. Dr. Salatich testified that, because of the history and course of treatment that Mrs. Fox had undergone, her condition was permanent and that she would continue to experience pain throughout the rest of her life.
In addition to the above related medical testimony, Mrs. Fox also produced her own testimony as to her condition, as well as the testimony of several relatives and friends with whom she was intimately acquainted. This lay testimony is all to the effect that prior to the accident, Mrs. Fox was an active, happy individual who experienced no difficulties, but enjoyed her work and her life. After the accident, she was a completely changed person, continuously suffering pain and unable to engage in her livelihood of sewing or of her hobby of gardening, and in fact could barely do any housework. We think it pertinent to note at this time that the testimony of Mrs. Fox is at considerable variance with the testimony of both doctors whom she has presented as witnesses. This is particularly true in the areas of the frequency and intensity of pain, and the wearing of her cervical collar. While we do conclude that she continued to suffer pain and discomfort at various intervals during this period of time, we think her testimony clearly exaggerates her experience thereof as she related her history to the doctors.
Opposed to the above described testimony, the defendant has produced as a witness Dr. Irving Redler, who examined Mrs. Fox on August 22, 1969. At this time she was also X-rayed and the X rays proved negative. On his examination of the patient he found no abnormalities and no muscle spasm. He found only that she complained of pain on extremes of motion. He felt that his examination showed no evidence of any residual disability and described the injury as a soft tissue injury from which a lady in Mrs. Fox’s age group (she was 56 years of age at the time) should recover in four months at the maximum. Dr. Redler also examined the X rays taken by Dr. Hopkins on April 21, *748 1971, in which Dr. Hopkins and Dr. Sala-tich found the asymmetry of the odontoid process, and pronounced those X rays within normal limits. He felt that the slight asymmetry demonstrated was within the range of operator technique and the difference in positioning of the patient at the time of the X rays.
Counsel for defendant insists to us that the findings of Dr. Redler substantiate the findings of Dr. Gordon, and that at most, Mrs. Fox suffered a soft tissue injury which cleared up without residual disability by January 30, 1969, and that she should only be entitled to recover to that extent. On the other hand, the plaintiff argues that she suffered pain throughout the entire period from the date of the accident to the date of the trial, and that her disability is now permanent.
We believe that we have given a fair summary of the medical history and treatment as outlined above. The jury obviously found that Mrs. Fox still suffered from her injuries because of the amount of the verdict rendered. We can only speculate as to the severity, of course, because there is no factual finding of the extent of injury. The X-ray findings of Dr. Salatich are concurred in by Dr. Hopkins. Additionally, we note that Dr. Gordon did not testify that Mrs. Fox was “cured”, but only that her symptomatology had decreased to a minimum, but that he would not be surprised to discover that she would continue to suffer pain in the future, although he did not think it would be of great consequence. Under these circumstances we cannot say that a finding of some permanent suffering by the jury would be without foundation or that it disclosed manifest error. However, we do believe that Mrs. Fox has clearly exaggerated her injuries and pain and discomfort she suffers. We have no way of knowing what the jury would have awarded, or did award, as damages for this particular injury, together with the attending pain and suffering, but we are of the opinion that a fair amount is $7,500.00.
Next, we shall consider the loss of earnings.
Mrs. Fox was 55 years of age at the time of the accident and she had made her living as a seamstress for some 25 years. She worked in her home sewing dresses and other clothing for other persons, and also did specialty sewing, such as weddings, and sewed the costumes for one carnival organization. She was extremely vague as to how much she made, stoutly maintaining that she never kept any records of any sort because she was too busy, nor did she ever file any income tax reports. Upon cross-examination, it was established that her claims of income amounted to a minimum of $7,000.00 per year. She does not claim that she is totally disabled and prevented from working entirely; however, she does insist that her income has been decreased to around 15 to 25% of her normal income. We have no way of knowing what the jury may have awarded her for loss of income, and in fact, we are not certain that the jury awarded her anything at all for this item of damages.[1] We assume that she must have lost some income during the period August 1, 1968 to January 30, 1969, but it is extremely difficult to determine the amount. As remarked above in relation to her injuries, we similarly believe that Mrs. Fox has exaggerated both her income and her loss of income.
While Mrs. Fox has produced four witnesses, two relatives and two friends, who *749 testified that she can no longer do the work that she used to do, and that on occasions she has had to seek assistance in finishing work she undertook, in particular the carnival hall and several weddings. We find nothing in the record which indicates how much this loss may be, either in money or in clientele.
We have been referred to the case of Jordan v. Travelers Insurance Company, 257 La. 995, 245 So.2d 151 (1971), and particularly to the following language which appears at p. 154:
“[5] Other intermediate decisions likewise hold, correctly, that a claim for loss of earnings need not be proved with mathematical certainty, but only by such proof as reasonably establishes the claim. This may even consist only of the plaintiff’s own reasonable testimony, if accepted as truthful; although of course the better practice is to introduce corroborating testimony. * * * ” (Cited cases omitted)
The difficulty in this case, as we see it, is that the plaintiff’s testimony as to her earning capacity is not reasonably or wholly believable. As remarked above, there was a period which we feel sure that she earned very little income. Once past that period, however, it appears to us that the evidence clearly establishes, even that of Dr. Salatich, that while she will suffer pain from time to time, this plaintiff is not disabled from doing work. Since she works in her home at an occupation wherein the time and duration of work period can be of her own choosing to a large extent, we do not feel that she has established at all the considerable loss that she claims. We note that there is no reference to the identity to any of her customers or business that may have been lost. There is no statement as to how much she may have paid others to help her in accomplishing the contracts that she did undertake. The only definite thing that she has established is that she could not do half of a carnival ball, for which she was to receive $2,000.-00. It is not shown how much this employment of others to complete the ball cost her, but we assume it is fair to determine that she lost $1,000.00. Since we have concluded that she obviously did lose income for which she should be reimbursed some amount, we can only exercise discretion and fix the additional amount of loss at the sum of $1,500.00, making a total loss of income of $2,500.00.
Finally, in regard to the damages, we find the following special damages which should be compensated for:
Dr. Hopkins $ 65.00
Dr. Gordon $330.00
Dr. Salatich $380.00
Automobile Damage_$100.00
Total: $875.00
We are thus of the opinion that the total award for damages in this case should be the amount of $10,875.00. We are aware of the duty of the trier of fact in assessing damages, and the subsequent duty of our appellate courts in passing upon such assessments. We are of the opinion that a finding of $25,000.00 is manifest error, and we cannot agree with such an award. We point out that there is no determination in the jury verdict as to any amount allotted to the items of damage which we have discussed above. We can only speculate as to the amount awarded for personal injuries and as to the amount awarded for loss of income, and we assume that amount awarded for special damages is the same as ours. However, we cannot conceive of any combination of the first two which justifies the award under the facts and circumstances of this case. Accordingly, we reduce the amount awarded to plaintiff to the above named sum.
SPECIAL JURY CHARGES
The appellant has complained to us that the court erred in refusing several re *750 quested jury charges. The first of these charges relates to the failure of Mrs. Fox to appear for an independent medical examination. Appellant requested two charges which are set out herein:
Special Charge No. 8
“The failure of plaintiff to submit to medical examinations requested by defendants both before and after suit had been filed affects the weight to be given her medical evidence as to her physical condition prior to her submission, after court order, after suit had been filed, to a medical examination by defendants.”
Special Charge No. 9
“The failure of the plaintiff to submit to a medical examination requested by defendants affects the weight to be given to her medical evidence as to her physical condition prior to her submission to an examination by defendant.”
The court refused to give either charge over the objections of defendants, but instead gave its own charge.
In its charge the court based the weight to be given the medical testimony to a determination of whether the defendant was in any way prejudiced by the interval of time between the request and the ability to obtain an examination by court order after suit was filed. We note that the defendant’s special charges contain no reference to a showing of prejudice against the defendant’s ability to defend as set out in the case of Arnold v. Patterson, 224 So.2d 820 (La.App. 4th Cir., 1969). See also Marullo v. Rooney, 245 So.2d 814 (La.App. 4th Cir., 1971). However, we call attention to the fact that we have decided in the case of Vaughn v. Commercial Union Insurance Company of New York, 263 So.2d 50 (La.App. 4th Cir., 1972) that Code of Civil Procedure articles 1432, 1434 and 1493, have provided a method of physical examination of a claimant prior to filing suit. In that case we held as follows:
“[6] Since the defendant in the instant matter did not proceed in accordance with LSA-C.C.P. arts. 1433, 1434 and 1493, but instead relied upon the oral and letter requests of its adjustor for such examination, we cannot invoke the appropriate penalty prescribed under Article 1513 for the plaintiff’s refusal to comply. * * * ”
We are of the opinion that the requested charges are not the correct statement of the law under either of these principles, and were properly denied by the trial judge.
The appellant also complains of refusal of the trial court to grant special charge number 7 relating to income taxes and special charge number 6 relating to attorney’s fees. The charges are set out hereafter:
Special Charge No. 7
“I charge you that in the event you determine to award damages you may, in fixing the amount, take into consideration the fact that the award you make is not subject to income or other taxes.”
Special Charge No. 6
“If under the Court’s instructions you find the plaintiff is entitled to a verdict, in fixing the amount of your award, you may not include in or add to, an otherwise just award, any sum for the purposes of punishing the defendant or defendants, nor does the law allow you to include in your award any sum for the payment of court costs or attorney’s fees.”
The judge refused to give the requested charges on the grounds that they were included in his general charge and was of the opinion that no special charge as to in *751 come tax or attorney’s fees was necessary under the circumstances of this case.
An examination of the record herein discloses that there is no particular factual situation herein which would seem to require a special point he made of the award being not subject to income tax nor does it permit any sum for the payment of attorney’s fees. No reference whatsoever is noted in the record for request for attorney’s fees, and insofar as the income taxes are concerned, the only evidence in the record indicates that Mrs. Fox had apparently never paid any income tax nor did she intend to. The trial judge in his own charge on the measure of damages covered the subject and pointed out to the jury the proper bases for awarding damages in this case. Since it was rather lengthy, it would be inappropriate to reproduce it all here. We find that the trial judge covered the question of the award adequately and there was no necessity to specially charge on either of these points.
CONCLUSION
We conclude, therefore, that there is no error in the ruling of the trial judge on the issues presented to us as error, that is, the permission of Dr. Salatich to testify as an expert witness, and the refusal of the trial judge to give the requested charges. As discussed hereinabove, however, we do find manifest error in the award of the jury in the amount of $25,000.00, which we consider to be excessive and an abuse of the sound discretion of the jury in awarding damages. Accordingly, we amend the judgment to the sum of $10,875.00.
It is ordered that there is judgment herein reducing the amount of the award from $25,000.00 to $10,875.00, and as thus amended we affirm the judgment appealed from. The cost of this appeal shall be paid by appellee.
Amended and affirmed.

. Counsel for plaintiff argues to us that the evidence showed that Mrs. Fox’s injuries caused a reduction in her earning capacity anywhere from $2,750.00 per year to $5,000.00. He further represents that Mrs. Fox’s remaining life expectancy is 16.25 years plus the 3 which passed before trial, making a total of 19.25 years (luring which she will not be able to reap full incpme from, her occupation of sewing. If the jury believed these to be the facts, it is apparent that the verdict of $25,000.00 to cover all damages is woefully short.